**SOUTHWEST MERCHANDISING CORPORATION d/b/a Handy Andy, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 89–1719.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1990.

Decided Sept. 13, 1991.

Frank S. Manitzas, San Antonio, Tex., for petitioner.

Karen L. Arndt, Atty., N.L.R.B., with whom Paul J. Spielberg, Deputy Asst. Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, D.C., were on the brief for respondent.

Before BUCKLEY, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Southwest Merchandising Corporation (the Employer) petitions for review of an order of the National Labor Relations Board, which determined that it violated §§ 8(a)(3) and 8(a)(1) of the National Labor Relations Act by discriminating against former strikers in hiring new employees. The Board has filed a cross-application for enforcement of its order. Because the reasoning of the Board's decision is not clear, we deny enforcement, grant the Employer's petition, and remand for clarification.

## I. BACKGROUND

In 1981 Handy Andy, a corporation operating retail grocery stores, filed for bankruptcy. In early 1982 the bankruptcy court entered an order nullifying the collective bargaining agreement between Handy Andy and its meat department employees, who were at that time represented by Local 171 of the United Food and Commercial Workers International Union. Soon afterward some of the meat department employees began an economic strike. In August, the Employer contends without contradiction, Handy Andy lawfully withdrew recognition of the Union after a poll of its employees showed that a majority no longer wanted the Union to represent them. By the end of 1982, 24 strikers had unconditionally offered to return to work, but Handy Andy rejected their offers on the ground that their positions had been eliminated or filled by permanent replacements. The Union notified the Employer that if it bought Handy Andy's grocery stores, then the Union would demand that it hire Handy Andy's striking meat department employees.

On January 31, 1983, Handy Andy ceased operations and terminated all of its employees. The next day the Employer purchased the grocery stores and hired some of Handy Andy's management. The news media reported that the transaction had taken place and that the Employer would be accepting job applications, but they did not say where or when, and the Employer apparently made no attempt to publicize that information.

The stores remained closed on February 2 so that employment applications could be taken there. According to the Employer, management generally selected employees that night from among those who had submitted applications that day. Some of those hired, however, had not submitted applications; instead, they were contacted personally by a store manager on February 2 or subsequently and told to report to work. The Employer contends that although some grocery department employees were hired through this informal process, every meat department employee that it hired had filed an application on February 2 and was selected upon the basis of that application. The record contains no evidence directly supporting or refuting this contention.

On February 3, the Employer reopened the stores for business. Of approximately 97 people employed in the meat department immediately before Handy Andy sold the stores, the Employer had hired 77. None of the former strikers had been hired.

According to testimony credited by the Administrative Law Judge, six former strikers had attempted on February 2 to apply at one or another of the Employer's stores with an identified supervisor, as did seven others later that month. Eight more former strikers testified that they attempted to apply on or after February 2, but they failed to establish that they spoke to a supervisor. The testimony of two other strikers who claimed to have tried to apply was discredited, and one striker said that she did not try to apply because she thought that Handy Andy's earlier rejection of her unconditional offer to return to work in 1982 indicated that "they weren't going to hire [her] anyway."

When they went to the stores to apply for work, most of the former strikers identified themselves as such, some before and some after they had been told that no positions were available. All but three were told that the meat department positions were filled and were refused applications. One of the Employer's supervisors testified that the two former strikers who managed to apply in February were rejected because

of their poor performance when employed by Handy Andy. The ALJ rejected this claim because it was vague about the nature of the problem and about when it had occurred and because it was unsupported by any other evidence.

During the next seven months, 60 vacancies in the meat department were filled, but no former striker was hired. A supervisor testified that at that time the Employer had a practice of promoting part-time store staff to full-time meat department openings, but the company offered no evidence to document this practice.

The General Counsel alleged that the Employer violated §§ 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3). Before the ALJ, the General Counsel pressed two theories: (1) the Employer "had obligations commencing when it started its operations ... to employ in due course, the former strikers," and (2) the Employer "is obligated to employ the strikers in a nondiscriminatory manner." ALJ Decision, slip op. at 3 (Feb. 20, 1985). In February 1985, the ALJ ruled that the Employer had committed unfair labor practices, *see id.* at 16, but it is impossible to discern the degree to which he based his decision upon each of these theories.

The ALJ apparently concluded that the Employer had "discriminatorily" refused to hire the 24 former strikers, *see id.* at 14–16. He found that (1) because (grocery department) employees who had not submitted an application had been hired, the Employer was not "justified" in refusing to consider the former strikers for employment (in the meat department) on the ground that they failed to submit a written application; (2) six strikers who had attempted to apply for work on the correct day, February 2, had been denied applications or rejected; and (3) the Employer's reason for rejecting the two employees who had been able to complete written applications in February (that they were unproductive) was "pretextuous"—a lovely neologism redolent of both "pretextual" and "preposterous"—as was (4) its explanation (that it had a practice of promoting part-time employees) for not hiring a single former striker despite filling

60 vacancies in the meat department after February 2. *Id.* at 12–14.

The ALJ's theory of "discrimination" is unclear, his reasoning further clouded by repeated references to a separate "successorship" theory of the Employer's obligation. The ALJ's view seems to be that because the Employer's initial work force overlapped substantially with Handy Andy's, the Employer was Handy Andy's "successor" and therefore had an obligation to reinstate the economic strikers when it received their unconditional offers to "return" to work. *See id.* at 4–5, 9–11, 12 & n. 17, 14 & n. 20, 15 & n. 22, 16. In any event, the ALJ ordered the Employer to pay backpay to each of the 24 former strikers and to reinstate them, "discharging, if necessary, anyone discriminatorily hired in place of" them. *Id.* at 17.

More than 4½ years later, the Board affirmed the ALJ's findings and his conclusion that the Employer had discriminatorily refused to hire the former strikers in violation of §§ 8(a)(1) and 8(a)(3). 296 N.L.R.B. No. 128, slip op. at 2 (Sept. 29, 1989). The Board characterized the Employer's formal application process as a "charade" designed to deny the strikers employment. *Id.* at 6. Although the Board stated that it was unnecessary to pass upon the ALJ's findings with regard to the obligation of a successor to reinstate employees engaged in an economic strike against its predecessor, the Board specifically stated that it agreed with the ALJ, "for the reasons stated by him," that the Employer is a successor to Handy Andy. *Id.* at 2.

The Board adopted the ALJ's order for backpay and reinstatement of all 24 former strikers, including the discharge-if-necessary provision. It justified extending these remedies to the three former strikers who had not applied for employment on the ground that, in light of the Employer's systematic refusal to permit former strikers to complete applications, any such application would have been futile. *Id.* at 8–9.

## II. ANALYSIS

The Employer argues that because the long delay between the ALJ's decision and the Board's order was inexcusable and prejudicial to it, we should not enforce that order. It also challenges the substantiality of the evidence of discriminatory hiring supporting the Board's unfair labor practice finding, and the broad scope of the remedy.

### A. Laches

■ In support of the first point, the Employer offers statistics intended to show that a large backlog of cases cannot explain the Board's 4½ year delay in reviewing the ALJ's decision. While this case was pending, the Employer points out, the number of Board decisions in unfair labor practice cases decreased while the median number of days before decision increased. In any event, it argues, this particular case was before the Board five times as long as the median case.

The Employer frankly concedes that "the circuit courts have uniformly refused to disturb either the Board's decisions or its remedial orders" on the ground of laches. Nonetheless, it makes a general policy argument in favor of encouraging prompt disposition by the Board, claims undue hardship, and seeks to distinguish the many cases in which the Supreme Court and the courts of appeals have refused to invoke the doctrine of laches when reviewing a long-delayed Board decision.

Whatever the merits of that policy argument, the Supreme Court appears to have prohibited this use of the judicial power, at least in circumstances such as those presented here. In *NLRB v. J.H. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969), the Board did not issue a backpay specification until four years after judicial enforcement of the backpay order. The court of appeals modified the Board's order, providing an early cutoff date for backpay, but the Supreme Court reversed:

> [T]he Court of Appeals' modification, cutting off the accrual of back pay ..., left the employees ... worse off than they would have been but for the company's wrongful action in refusing reinstate-

ment. Either the company or the employees had to bear the cost of the Board's delay. The Board placed that cost upon the company, which had wrongfully failed to reinstate the employees. In an effort to discipline the Board for its delay, the court shifted part of that cost from the wrongdoing company to the innocent employees.

*Id.* at 263–64, 90 S.Ct. at 420. *See also NLRB v. International Ass'n of Bridge, Structural & Ornamental Ironworkers,* 466 U.S. 720, 724–25, 104 S.Ct. 2081, 2083–84, 80 L.Ed.2d 715 (1984) (reversing court of appeals' modification of backpay specification to include only charging employees where Board had delayed amending specification).

In an attempt to distinguish *Rutter–Rex,* the Employer points out that the delay there occurred at the compliance stage of the proceedings, "after [the] employer ha[d] been advised of the agency's determination." Even a delay after the Board has determined that an employer is liable, however, may prejudice the employer if there is still substantial uncertainty about which employees are entitled to reinstatement, because backpay liability continues to accrue until the employer has made an offer of reinstatement to each of them. In *Rutter–Rex* itself, the determination of which individuals were entitled to a remedy was left to the compliance stage, 396 U.S. at 260, 90 S.Ct. at 418, yet the Court found that the employees' interests trumped those of the wrongdoing employer.

The Employer relies upon the dissent in *NLRB v. Staub Cleaners,* 418 F.2d 1086, 1090–93 (2d Cir.1969) (Lumbard, J., dissenting). In cases such as *Staub,* circumstances that changed during the administrative delay arguably rendered the (nonbackpay) remedial order against the employer nonsensical or even inimical to employee interests. *E.g., Emhart Indus. v. NLRB,* 907 F.2d 372, 379 (2d Cir.1990) (court "must withhold enforcement of orders that will not effectuate any reasonable policy of the act, even where the problems with the order are caused primarily by the lapse of time"); *see also NLRB v. Katz,* 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114

n. 16, 8 L.Ed.2d 230 (1962) (rejecting argument that delayed bargaining order should not be enforced where union might no longer have majority support). Because a backpay order " 'is a reparation order designed to vindicate the public policy of the [NLRA] by making the employees whole for the losses suffered on account of an unfair labor practice,' " *Rutter–Rex,* 396 U.S. at 263, 90 S.Ct. at 420 (quoting *Nathanson v. NLRB,* 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23 (1952)), we will enforce such an order even where the Board's delay is, as here, "deplorable," *id.* 396 U.S. at 265, 90 S.Ct. at 421. *See NLRB v. S.E. Nichols, Inc.,* 862 F.2d 952, 963 (2d Cir.1988) (distinguishing between bargaining order and order designed to remedy the effects of past unfair labor practices, and enforcing order of latter type although delayed for 6½ years).

In sum, we have no warrant for distinguishing this case from *Rutter–Rex.* Assuming that we have the authority to invoke laches against the Board in an extraordinary case, *cf. Rutter–Rex,* 396 U.S. at 265, 90 S.Ct. at 421, this is not it. The extent of the relevant time lapse, while great, was hardly more than the delay in *Rutter–Rex* itself. Moreover, the Employer had notice from the outset, i.e., from the ALJ's decision, that it might well be held liable for accruing backpay to a defined group of employees. Finally, there is no suggestion that the employees are to blame for the delay.

## B. *The Unfair Labor Practice*

 The Employer next argues that there is not substantial evidence in the record to support the Board's determination that, in initial hiring and in filling subsequent vacancies, it discriminated against the former strikers on the basis of their union activity. *See* 29 U.S.C. § 160(e). Specifically, the Employer argues that the Board reached that conclusion only because it confused grocery with meat department hiring procedures and unjustifiably failed to credit testimony to the effect that there were legitimate business reasons for the hiring procedures it used.

In our view the Board's opinion is ambiguous with regard to the theory of employer obligation upon which it rests, particularly in light of the several apparent gaps in its findings and reasoning relating to the "discrimination" theory. Thus, before we can address the question whether there is substantial evidence for the Board's conclusion, the Board must clarify its legal theory, make more explicit findings of fact, and explain the relationship between those findings and its theory.

It is well-established that an employer that declines to hire a person because of his or her union membership or union activity violates § 8(a)(3) and thereby § 8(a)(1) of the NLRA. *See Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 262 n. 8, 94 S.Ct. 2236, 2243 n. 8, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Int'l Security Servs.*, 406 U.S. 272, 280 n. 5, 92 S.Ct. 1571, 1578 n. 5, 32 L.Ed.2d 61 (1972); *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1551 (D.C.Cir.1984) ("To establish a violation of section 8(a)(3), and thereby a violation of section 8(a)(1), the General Counsel must establish that the employer acted 'to encourage or discourage membership in any labor organization,' that the employer acted discriminatorily, and that the employer was motivated by an anti-union animus."). In order to establish liability for such discriminatory hiring, the General Counsel must make a *prima facie* showing sufficient to support an inference that the employee's participation in the protected conduct (here, participation in a strike) was a "motivating factor" in the employer's decision. The burden then shifts to the employer to demonstrate that it would have taken the same action even if the employees had not engaged in the protected conduct. *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). In making findings regarding discriminatory motive, the Board may consider circumstantial evidence, including the nature of the employer's conduct itself. *United Food & Commercial Workers Int'l Union, Local 152 v. NLRB (Spencer Foods)*, 768 F.2d 1463, 1475 (D.C.Cir.1985).

In its opinion the Board said that it "agree[s] with the [ALJ] ... that [the Employer] discriminated against the former strikers in its original hiring process." 296 N.L.R.B. No. 128, slip op. at 2. This is not quite the same as finding that the Employer discriminated against the former strikers because of their union activity; there is a difference between discriminatory intent, or in labor law terms, anti-union animus, and mere disparate impact. *See Elastic Stop Nut Div. of Harvard Indus. v. NLRB*, 921 F.2d 1275, 1280 (D.C.Cir.1990). In light of certain other passages in the Board's opinion, however, *see, e.g.*, 296 N.L.R.B. No. 128, slip op. at 6 ("[A] new opener cannot lawfully refuse to hire employees of his predecessor because they engaged in a lawful economic strike. In this case, the facts establish that [the Employer's] public application process was a charade designed, at least in part, to discriminatorily deny the former economic strikers employment"), we would be inclined nonetheless to view the Board as having made the necessary finding—but for certain other related difficulties.

We recall the ALJ's frequent references to, and his possibly determinative reliance upon, the "successorship" theory for holding the Employer obligated to hire the strikers. More important, we note the following statement, prominent in the opening of the Board's decision:

> We agree with the [ALJ] for the reasons stated by him that [the Employer] is a successor to Handy Andy, Inc., debtor-in-possession.... We ... find it unnecessary to pass on his findings regarding the *Laidlaw* obligations of a successor to former economic strikers....

*Id.* at 2.

The Board makes no further reference to the Employer's status as a successor. If, however, the Board's decision is grounded entirely upon the theory that the Employer discriminated in hiring based upon union activity, then it is unclear why the Board made any finding as to the Employer's status as a successor. We cannot dismiss the possibility that the several ambiguities and weaknesses in the Board's reasoning

stem from a confusion between the succession and the discriminatory motive theories of liability. In particular, the opinion may rest upon an unarticulated assumption that a successor has a special obligation to favor the employees of its predecessor, or at least to treat them all in the same way.

*First.* The Board seems to rely heavily upon the Employer's having given personal notice of the application procedure to some incumbent employees and having waived the application requirement altogether for others. *See id.* at 6–7. The record evidence indicates only that the Employer gave notice to, or waived applications for, grocery department employees, not meat department employees.

The Board might have inferred from evidence of personal notification to some grocery employees, and from the large number of meat department incumbents hired, that some meat department incumbents must also have been called. Neither the ALJ nor the Board made an express finding to this effect, however. *Cf. Local Union 1395, IBEW v. NLRB,* 797 F.2d 1027, 1036 (D.C.Cir.1986). Even assuming that we could fairly infer that the Board made that finding, it would still not be clear whether the Board viewed the disparity in the treatment of incumbent employees and former strikers as evidence of anti-union animus. If so, the Board may be faulted for failing to consider other possible reasons for which supervisors might notify only incumbent workers of the application procedures—for example, because they were more familiar with the incumbents' work, or had readier access to the incumbents' telephone numbers.

If the Board did not silently infer that meat department employees were also given personal notice, then the basis for a finding of anti-union animus is even more obscure. One could perhaps argue that a difference in the procedures used in the two departments itself evidences anti-union animus, on the theory that the Employer, cognizant that all the strikers were former meat department employees, instituted stricter application criteria for that department in the hope that fewer former strikers would apply. The Board has not, however, explicitly adopted that theory either.

More generally, we suspect that the Board's lack of clarity as to the theory of liability may have caused it to overlook an alternative explanation for any preference that the Employer may have given to some incumbent workers: they had recent experience in working together at the same stores, and the current supervisors were familiar with their performance. The Board's failure to consider such an obvious alternative explanation is especially troubling because it apparently made no finding that anyone associated with the Employer ever made any statement indicating hostility to the Union or to unions generally. *Cf., e.g., Elastic Stop Nut,* 921 F.2d at 1278, 1280, 1281. If the Board sees the Employer's preference for incumbent workers as evidence of anti-union animus, then it should explain why it infers anti-union animus from a preference that has an obvious business justification. If, as is suggested at several points in its decision, the Board believes that any inconsistency between the Employer's stated hiring plan and its actual practices is itself evidence of anti-union animus, then the Board should both make its reliance upon that factor explicit and articulate more clearly what the inconsistencies were.

*Second.* The Board may instead have implicitly relied upon the theory that the Employer, as a "successor" company, has some special obligation to hire or to give notice to the employees of its predecessor company without regard to whether they are incumbent workers or former strikers. (Similarly, assuming the Board did not find that any meat department employees were given specific notice of how to apply, it may still have found liability on the ground that a successor has some special obligation to treat incumbent employees and former strikers similarly, which obligation overrides any possible business justification for using different hiring procedures in different departments.) If so, it did not articulate the legal basis for, or the boundaries of, such an obligation.

In sum, we are unable adequately to review the Board's decision as a result of (1) the ambiguity surrounding its legal theory and the relationship of that theory to the facts found, (2) the absence of any finding as to whether any meat department workers were given notice of the application procedures, and (3) the Board's failure to consider obvious alternative explanations for the Employer's hiring as and whom it did. We therefore remand this matter to the Board for clarification.

### C. *The Remedy*

█ The Board's reasoning is also insufficient to justify the broad scope of its remedial order. For example, as noted earlier, there was no credited evidence that three of the employees covered by the backpay and reinstatement order ever applied for a position. *See* ALJ Decision at 7–8 (Walker, Cabrera, and Wendel). The ALJ did not explain why he included those employees in the remedial order, but the most likely reason is that making an application would be irrelevant under his successorship theory of liability. *See id.* at 12–13 & n. 17.

The Board explained its affirmance of the remedy in favor of all 24 former strikers as follows:

> [A]s [the Employer's] almost unvarying refusal to permit the former strikers who sought employment on February 2 even to fill out applications appears to have applied to all former economic strikers, bar none, we find that the claimed *attempts by other economic strikers to apply*, whether credited or not, *would have been futile....* Accordingly, we find that all the former economic strikers are entitled to immediate employment ... and to backpay ...

296 N.L.R.B. No. 128, slip op. at 8–9 (emphases supplied); *see also id.* at 9 n. 10. The Board did not explain in any fashion why it granted a remedy to the strikers who applied after February 2. A sense of futility could not explain their filing late. Without further elucidation of its legal theory or more specific findings of fact, its invocation of the futility doctrine is insufficient to justify extending the remedial order to all 24 former strikers.

As to the three former strikers who never applied, the Board relied upon *State Distributing Co.*, 282 N.L.R.B. 1048 (1987), and *Macomb Block and Supply*, 223 N.L.R.B. 1285, 1286 (1976), *enf. denied*, 570 F.2d 1304 (6th Cir.1978), *see* 296 N.L.R.B. No. 128, slip op. at 9, but both of those decisions appear to involve something more than "objective" futility. In *Macomb Block*, the Board reported that it "has always held that where an employer makes known to prospective employees his refusal to hire them because of their prior union affiliation their failure to undertake the useless act of making formal application for work is no defense to an 8(a)(3) allegation." 223 N.L.R.B. at 1286. *See also R & L Cartage & Sons Inc.*, 292 N.L.R.B. 530, 531–32 (1989) (distinguishing *State Distributing Co.*, and reversing ALJ's finding of §§ 8(a)(3) and 8(a)(1) violations in part because "there is no evidence that [the employer's discouraging] statement deterred the former ... employees in general from applying," *id.* at 532).

Here, by contrast, the Board appears to have excused the strikers' failure to apply, based upon futility, without finding (1) that the Employer took any action indicating to any of them that applying would be futile or (2) even that any of them subjectively believed that their earlier union activity rendered application to this Employer futile. *Cf. GSX Corp. v. NLRB*, 918 F.2d 1351, 1358, 1359 (8th Cir.1990) (distinguishing cases in which company had made it clear to unionized employees that it would not hire them). The Board does state that former striker Walker did not apply because she thought it would be futile to do so, *see* 296 N.L.R.B. No. 128, slip op. at 5 n. 7; but she apparently came to that conclusion only because of Handy Andy's refusal to rehire her, for which the Board does not say it is holding the Employer responsible as a successor or otherwise.

The Board decision cites no case holding that nonapplication by someone ignorant of the employer's animus could be excused on the ground of futility. If the Board means

to stake out new ground in this area, then it should say so. Presumably, if the Board does discard the requirement of a subjective perception of the futility of applying, it will also need to adopt some other method for limiting the class of persons entitled to a remedy.

As to the late-filing strikers, it is possible that in granting them relief the Board implicitly relied upon their lack of adequate notice regarding the application procedure, rather than upon a futility theory, to excuse their tardiness. If the Employer were found purposely to have concealed information about the application procedure from former strikers because of anti-union animus, then that might provide an alternative theory of causation sufficient to support granting a remedy to any striker prejudiced by the concealment. *See GSX,* 918 F.2d at 1358–59; *American Press v. NLRB,* 833 F.2d 621, 627 (6th Cir.1987); *cf. Kessel Food Markets,* 287 N.L.R.B. 426, 431 (1987) (nonapplicant not deemed discriminatees because record did not support a finding that they were prevented from applying because of employer's "blind" advertisements). The Board did not, however, expressly rely upon a concealment theory; the "futility" statement quoted above represents the agency's entire explanation for extending the remedy to all 24 former strikers. Nor did the Board expressly make the necessary factual finding—that concealment is what prevented each strik-

er, other than those who did attempt to apply on February 2, from making timely application.

The Employer also complains that the NLRB's remedy departs from precedent in requiring it to hire those it had discriminated against even if doing so would require it to discharge other employees. Because the Board's decision on remand may obviate the need for review of this feature of the order, we do not address it here.

### III. Conclusion

We remand to the Board so that it may clarify its theory of the Employer's obligation, make any findings of fact necessary to support application of that theory, and consider alternative explanations for the Employer's actions. The Board should also clarify what must be shown to entitle a non-applicant (or an applicant who did not fully and timely comply with hiring procedures) to a remedy for discriminatory hiring practices, and explain how that showing has been made with respect to each former striker to whom it grants relief.

*So ordered.*