United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 5, 2001 Decided January 8, 2002 

 No. 00-1525

 Sasol North America Inc., 
 Petitioner

 v.

 National Labor Relations Board, 
 Respondent

 Petition for Review and Cross-Application 
 for Enforcement of an Order of the 
 National Labor Relations Board

 James P. Gillece Jr. argued the cause for petitioner. With 
him on the briefs was Robert R. Niccolini.

 Siobhan M. Kelly, Attorney, National Labor Relations 
Board, argued the cause for respondent. With her on the 
brief were Arthur F. Rosenfeld, General Counsel, John H. 
Ferguson, Associate General Counsel, Aileen A. Armstrong, 

Deputy Associate General Counsel, and Frederick C. Havard, 
Supervisory Attorney.

 Before: Sentelle and Rogers, Circuit Judges, and 
Williams, Senior Circuit Judge.

 Opinion for the Court filed by Senior Circuit Judge 
Williams.

 Williams, Senior Circuit Judge: Sasol North America, Inc. 
(formerly known as Condea Vista Chemical Co.) appeals from 
the National Labor Relations Board's ruling that it violated 
various provisions of the National Labor Relations Act, 29 
U.S.C. s 151 et seq. The charge: that Sasol, inspired by 
anti-union animus, had unilaterally (i.e., without affording the 
union an opportunity to bargain) abandoned an unwritten 
policy allowing unlimited unpaid leave for union leaders to 
work on union business. The Board found both anti-union 
animus and refusal to bargain. See Condea Vista Company, 
2000 NLRB LEXIS 813, 332 NLRB No. 117 (Nov. 16, 2000). 
In fact, however, the Board simply assumed its starting 
point--that Sasol had previously had a policy of unlimited 
leave, in the sense that the Board conceived it: leave at any 
time and in any amount, so long as the leave was taken for 
union activity. Additional errors followed. We therefore 
reverse and remand for further proceedings.

 * * *

 Sasol operates a chemical manufacturing facility in Lake 
Charles, Louisiana. Its workers are represented by the 
Paper, Allied Industrial, Chemical and Energy Workers In-
ternational Union No. 4-555. The collective bargaining 
agreement explicitly provides that union leaders may take 
reasonable paid leave:

 22-4 Worker's Committee and Stewards shall be permit-
 ted reasonable time to investigate, present, and process 
 grievances on [Sasol] property during their regular work-
 ing hours without loss of time or pay. Such time spent 
 in handling grievances, or mutually agreed-upon Union 
 business, during the Steward's alternate's or Worker's 
 
 Committee's regular working hours shall be considered 
 working hours in computing daily and/or weekly overtime 
 if within the regular schedule of the employee.
 
Though there is no provision in the CBA relating to unpaid 
leave for union activities, such leave was commonly taken 
pursuant to an unwritten policy (the exact nature of which is 
at issue).

 This case was precipitated in April 1998, when Daren 
Appleby, president of Local No. 4-555 and a plant operator 
(as both parties describe him, though without explanation of 
his responsibilities), filed a grievance complaining that he had 
not received adequate training. Appleby's supervisors re-
sponded that Appleby had failed to receive training simply 
because he was so often absent from work.

 That claim gave rise to an internal investigation, finding 
that Appleby had taken unpaid union leave from about 36% of 
his scheduled work periods between January and October of 
1998; the ultimate figures for all of 1998 showed that he 
missed 35% of his work periods for unpaid leave and an 
additional 9.5% because of vacation and sick days.

 This prompted Sasol to crack down on Appleby's liberal use 
of unpaid leave. In a letter dated October 30, 1998, Jim Ely 
(Sasol's Human Resources Administrator) admonished Apple-
by that "36% absence for off-property Union business is too 
much and we expect to approve less of this type in the 
future." Ely went on to say, "We will approve a reasonable 
amount of Union business time for on-site Union business as 
specified in Article 22-4, as possible given the nature of 
Operations and Maintenance work here at CONDEA Vista, 
and only with prior approval of each Committeeman's imme-
diate supervisor."

 In December of 1998, Appleby met with three Sasol manag-
ers: Chris Turner, Mike Glackin, and Jim Ely. The manag-
ers all testified that Turner brought up the issue of unpaid 
leave, and Appleby responded that he did not have to talk 
about that issue. Appleby himself, when asked if anything 
was said at the meeting about unpaid leave, first said, "I don't 

recollect," but went on to deny that he had refused to discuss 
excessive unpaid leave.

 Sasol followed up the October 1998 letter with one sent on 
February 26, 1999 from Jim Ely to Appleby. The letter said:

 As stated previously, we will no longer be able to 
 provide this large amount of excused time for off-
 property Union-related matters. The need to operate 
 the plant efficiently and for all employees to stay cur-
 rently trained on their job requires that all employees 
 attend work regularly.
 
 Effective March 15, 1999, we will administer Article 
 22-4 as written. There is no provision in 22-4 for 
 excused time off for Union-related matters off Company 
 property.
 
 We will approve a reasonable amount of on-site Union 
 business time for Worker's Committee members and 
 Stewards as specified in Article 22-4, as possible, upon 
 advanced request, with a general description of what the 
 time is needed for, to the employee's immediate Supervi-
 sor.
 
Characterizing this as a change in company policy, the union 
replied on March 4, 1999, requesting that Sasol meet and 
bargain. Sasol manager Chris Turner responded March 10, 
saying: "With respect to your alleged demand for bargaining 
over this 'change,' no change is being implemented. To the 
contrary, the Company is simply applying Article 22-4 as 
written."

 An increasingly acrimonious series of letters followed be-
tween Appleby and various Sasol managers. Perhaps from a 
change of heart (or perhaps fearing impending litigation), 
Human Resources Manager Mike Glackin wrote Appleby on 
June 29, 1999, offering to bargain with the union over the 
issue of unpaid leave. By this point, however, Appleby had 
apparently lost interest in bargaining, and chose instead to 
file unfair labor practice charges with the Board. After a 
hearing in January 2000, the ALJ held that Sasol had violated 
ss 8(a)(1), (3), and (5) of the NLRA, 29 U.S.C. ss 158(a)(1), 
(3), (5). See Condea Vista Company, 2000 NLRB LEXIS 

813, at *7, 332 NLRB No. 117 (Nov. 16, 2000) (reprinting 
ALJ's decision).

 The ALJ first found that Sasol's "policy before October 
1998 was to grant unpaid leave for Union business away from 
its plant." 2000 NLRB LEXIS 813, at *15-*16. The ALJ 
chose to discredit (apparently as hearsay) Jim Ely's testimo-
ny that company supervisors had in the past denied requests 
for unpaid union leave. Id. at *27.

 The ALJ then found that Sasol's change in this policy was 
motivated by anti-union animus, a violation of ss 8(a)(3) and 
(1) of the NLRA, 29 U.S.C. ss 158(a)(3), (1). Id. at *22. The 
ALJ relied mainly on testimony by Gary Beevers, an interna-
tional union representative. Beevers testified that in an April 
1999 meeting with Mike Glackin and Jim Ely, Glackin had 
said that the suspension of unpaid union leave was because 
Appleby "was using that leave to prepare untrue Union 
leaflets ... and frivolous complaints with the NLRB and 
numerous data demands." Id. *16-*17, *20-*21. Glackin 
denied this version of their meeting, but the ALJ credited 
Beevers's testimony, apparently relying substantially on Glac-
kin's notes of the meeting. Id. at *16-*17.

 Sasol offered a defense under Wright Line, 251 NLRB 
1083 (1980), enf'd 662 F.2d 899 (1st Cir. 1981), saying that it 
would have taken the same action regardless of any alleged 
anti-union animus. It reasoned that Appleby's extended peri-
ods of absence were an "abuse" of the unpaid leave policy, 
and that such absences resulted in a lack of adequate job 
training, thus threatening the safety of operations at Sasol's 
plant. The ALJ, however, reconceived the concept of "abuse" 
as limited solely to whether Appleby's union leaves had been 
for personal business, id. at *21-*22, evidently assuming that 
Sasol could not regard leave as "abusive" merely because it 
prevented the worker from performing necessary functions 
(here, as Appleby's grievance had highlighted, attending safe-
ty training). Having so narrowed the abuse inquiry, the ALJ 
concluded that Sasol failed to establish its Wright Line 
defense. Id. at *22.

 The ALJ then found that Sasol had violated s 8(a)(5) of the 
NLRA, 29 U.S.C. s 158(a)(5), by failing to bargain with the 
union before changing its unpaid leave policy. Id. at *22-*23 
(citing NLRB v. Katz, 369 U.S. 736, 745-47 (1963)). In 
reaching this conclusion it held that neither of the two main 
exceptions to a company's duty to bargain was present in this 
case: the union's use of dilatory tactics to avoid bargaining, 
or economic exigencies demanding immediate action. Id. at 
*28-*29 (citing International Paper Company, 319 NLRB 
1253, 1273-74 (1995)).

 Following the filing of exceptions by both parties, the 
Board adopted the ALJ's decision in full. Condea Vista 
Company, 2000 NLRB LEXIS 813, 332 NLRB No. 117 (Nov. 
16, 2000). In addition, the Board noted that Mike Glackin 
had allegedly told Gary Beevers that unpaid leave was to be 
canceled in part because of the union's "frivolous complaints 
with the NLRB." Because there was no evidence of any 
frivolous complaints, the Board found that Sasol had violated 
s 8(a)(4), 29 U.S.C. s 158(a)(4) (penalizing discrimination 
"against an employee because he has filed charges ... under 
this subchapter"). Id. at *2 n.4.

 * * *

 We think that the Board erred on three crucial issues: 
whether Sasol changed its unpaid leave policy; whether Sasol 
acted out of anti-union animus; and whether Sasol presented 
a valid Wright Line defense.

 The Board maintains that before the Appleby episode Sasol 
allowed unlimited unpaid leave, which is why it required Sasol 
to post a notice saying that it would not "change our policy of 
granting unlimited unpaid leave...." 2000 NLRB LEXIS 
813 at *38. And the Board's lawyer at oral argument admit-
ted that, in the Board's eyes, Sasol's policy would have 
allowed a union official to spend 95% of his working time 
tending to union affairs.

 Not only is there no substantial evidence to support this 
interpretation of Sasol's unpaid leave policy, there is no 
evidence whatever in the record before us. The Board relied 

on the fact that Appleby took a "substantial amount of unpaid 
leave for union business during 1997 and 1998." But Sasol 
tried to limit Appleby's leave to something more reasonable 
as soon as his extended absences came to its attention; the 
mere fact that Appleby got away with lavish leave for a year 
or so does not establish that there was ever a general policy 
of unlimited leave.

 The Board argues that Sasol had never before claimed that 
a "union official had abused the policy by taking too much 
unpaid leave." Respondent's Br. at 19. But, as the Board's 
lawyer admitted, there is no evidence that any other union 
official ever tried to take 36% of his time in unpaid leave. It 
is hard to imagine that a rational firm would ever, absent 
very substantial concessions by the union, agree to a leave 
policy as unlimited as the Board assumed. To assert that 
Sasol had a policy of unlimited leave requires at least some 
evidence--and the Board has none.

 One might think that even if the leave policy had been 
short of "unlimited," Sasol might be liable for a unilateral 
change if, without bargaining, it eliminated unpaid leave 
altogether. But the evidence on Sasol's conduct is unclear, 
and neither the ALJ nor the Board ever found that Sasol 
changed from a policy of reasonable unpaid leave to none at 
all. It is questionable whether substantial evidence would 
support any such finding.

 Sasol's letter of February 26, 1999--which the Board's 
brief characterizes as having "terminate[d]" unpaid leave--
never even refers to a distinction between paid and unpaid 
leave. Rather, it says that Sasol will no longer provide leave 
for "matters off Company property"--apparently whether 
paid or unpaid. Instead, "Effective March 15, 1999, we will 
administer Article 22-4 as written." The effect of this state-
ment on unpaid leave is murky, since Article 22-4 doesn't 
mention unpaid leave at all. Sasol might have meant that 
since Article 22-4 is silent on unpaid leave, it would hence-
forth never permit such leave. Alternatively, it might have 
meant that unpaid leave would be limited by a criterion of 
reasonableness--as Article 22-4 provided in the case of paid 

leave. Sasol (through its lawyer and its managers' testimony) 
seemed generally to have envisioned a policy of reasonable 
unpaid leave, consistent with the latter reading. See, e.g., 
Joint Appendix 18, 19, 82, 101, 116, 134-36, 161, 270-71, 510; 
but compare id. 52, 71, 91, 92, 98, 99, 100, 109, 263.

 Indeed, one of Sasol's exceptions to the ALJ's ruling was 
that the ALJ failed "to find that the reasonable limitations 
placed upon unpaid union leave by Condea Vista mirrored 
and tracked the reasonable limitations placed on paid union 
leave pursuant to Section 22-4...." Absent a finding on the 
point supported by substantial evidence, we cannot affirm the 
Board's order on an assumption Sasol actually changed its 
unpaid leave policy, as opposed to merely enforcing a pre-
existing reasonableness criterion.

 Next, we think the Board erred in its conclusion that Sasol 
acted out of anti-union animus. The evidence for this conclu-
sion is paltry at best. The ALJ first relied on Jim Ely's 
October 30, 1998 letter saying that Appleby's leave time was 
" 'too much and we expect to approve less of this type in the 
future.' " After quoting this letter, the Board states that 
"Appleby and other Union officials were engaged in protected 
activity when handling Union business." Condea Vista, 2000 
NLRB LEXIS 813, at *20. Though no argument is spelled 
out here, the implication is that because Appleby was taking 
time off for union activities, Sasol could have no motivation 
for limiting his leave other than to curtail the union activities. 
But this would make sense only on the Board's assumption 
that Sasol had a policy of totally unconstrained union leave--
an assumption without any basis. Just as an employee 
cannot "shield himself from all possibility of termination 
merely by becoming a union activist," Synergy Gas Corp. v. 
NLRB, 19 F.3d 649, 652 (D.C. Cir. 1994), neither can a union 
official--absent a bargain to that effect--shield himself from 
ever having to show up for work merely by conducting union 
business. And, as we discuss in more detail below, Sasol 
made it clear on numerous occasions--both in discussions 
with the union and in testimony before the ALJ--that it 
thought Appleby's continued absences were unreasonable.

 The second (and last) piece of evidence for anti-union 
animus is an account of the April 1999 meeting between Mike 
Glackin, Jim Ely, and international union representative Gary 
Beevers. As noted above, Beevers testified that Glackin said 
that the unpaid leave policy was to be revoked because 
Appleby had used his time off to prepare untrue union 
leaflets, frivolous complaints with the NLRB, and numerous 
data demands. Glackin, for his part, said that "Mr. Beevers 
either made an untrue statement, or Mr. Beevers clearly 
misunderstood something that I said." The ALJ resolved the 
conflict in favor of Beevers, explaining that Glackin's own 
handwritten notes of the meeting "tend to support the testi-
mony of Beevers." Condea Vista, 2000 NLRB LEXIS 813, at 
*17, *21. This support allegedly comes from two sentences in 
the Glackin notes: "I pointed out the examples of the Union 
grieves and arbitrates every issue, that they have filed nu-
merous info requests which are frivolous and harass-
ment...." and "I further mentioned a charge that Jim Ely 
had threatened the lives of Ray Reynolds and his family and 
then would not allow me to properly investigate the charges, 
is another example of the Union not Mgmt. straining the 
possibility of establishing a better working relationship." 
J.A. 507, 508; 2000 NLRB LEXIS 813 at *17.

 But the ALJ's use of the Glackin notes was palpably 
defective. The two statements relied on by the Board appear 
in the part of Glackin's notes describing his and Beevers's 
discussion of the union/management relationship in general, 
not the leave policy. J.A. 507-08. Two pages later the notes 
recount the parties' discussion of unpaid leave. They report 
that Glackin told Beevers that the issue arose because Apple-
by filed a grievance for insufficient training, and Appleby's 
supervisors said that "he's never here @ work and they have 
a big concern about him keeping current...." J.A. 509. 
Thus, contrary to the ALJ's view, Glackin's notes do not 
support the idea that he told Beevers that the leave policy 
was changed because of objections to the content of union 
activity. In context, the two statements recorded by Glackin 
do not even remotely constitute evidence of a "threat of 
reprisal or force or promise of benefit," 29 U.S.C. s 158(c); 

under that provision, therefore, they cannot be used as "evi-
dence of an unfair labor practice under any of the provisions" 
of the NLRA. Id.; see also Medeco Security Locks, Inc. v. 
NLRB, 142 F.3d 733, 744 (4th Cir. 1998); BE & K Constr. Co. 
v. NLRB, 133 F.3d 1372, 1375-77 (11th Cir. 1997); Holo-
Krome Co. v. NLRB, 907 F.2d 1343, 1345-47 (2d Cir. 1990); 
Ross Stores, Inc. v. NLRB, 235 F.3d 669, 676 (D.C. Cir. 2001) 
(Henderson, J., concurring). While an agency's credibility 
decision normally enjoys almost overwhelming deference, it 
does not do so when it rests explicitly on a mistaken notion. 
See, e.g., United States ex rel. Exarchou v. Murff, 265 F.2d 
504, 507 (2d Cir. 1959) (agency credibility decision reversible 
where based simply on mistaken view of the story's plausibili-
ty).

 Given the Board's mistaken understanding of the Compa-
ny's unpaid leave policy and its misplaced reliance on Glac-
kin's notes, its finding that Sasol's policy was driven by anti-
union animus is unfounded. See Southwest Merchandising 
Corp. v. NLRB, 943 F.2d 1354, 1361 (D.C. Cir. 1991) (Board 
failures in reasoning prevent review for substantial evidence).

 Finally, we find no justification for the short shrift the ALJ 
gave Sasol's Wright Line defense--its argument that it would 
have taken the same action (whether characterized as change 
or as enforcement) regardless of any alleged anti-union ani-
mus. The ALJ treated this solely as a claim that Appleby 
was using his union leave for personal rather than union 
business. 2000 NLRB LEXIS 813 at *21. Sasol did raise 
that narrow claim, and we'll assume the ALJ's rejection was 
supported. But Sasol also raised the general point that 
Appleby's lengthy absences constituted an "abuse" of its 
policy, see J.A. 91, 99, 113, 125-26, 158, 165, 174-75, and the 
specific argument that the extended absences caused a lack of 
current training, in turn leading to increased safety risks, see, 
e.g., J.A. 113, 160, 166. Sasol's February 1999 letter made 
the point explicitly, asserting the "need to operate the plant 
efficiently and for all employees to stay currently trained on 
their job [sic]." Again, we need not decide on the validity of 
these "obvious alternative explanations," Southwest Merchan-
dising Corp., 943 F.2d at 1361, as the Board never even 

considered them. The Wright Line defense is therefore yet 
another issue the Board must consider on remand. Cf. 
McQuaide, Inc. v. NLRB, 133 F.3d 47, 50 (D.C. Cir. 1998). 
Of course, "[t]he weaker a prima facie case against an em-
ployer under Wright Line, the easier for an employer to meet 
his burden ... of proving that the [employer's action] would 
have occurred regardless of the protected activity." Hartley 
v. NLRB, 669 F.2d 579, 582 (9th Cir. 1982).

 Finally, we cannot sustain the Board's finding that Sasol 
violated 29 U.S.C. s 158(a)(5) by failing to bargain before 
"changing" the unpaid leave policy. Because it is impossible 
to say whether there was substantial evidence of any such 
change, it is premature to consider the issue of breach of the 
duty to bargain.

 * * *

 We reverse the Board's decision and remand the case to 
the Board for further proceedings consistent with this opin-
ion.

 So ordered.