**SASOL NORTH AMERICA INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 00–1525.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 2001.

Decided Jan. 8, 2002.

James P. Gillece Jr. argued the cause for petitioner. With him on the briefs was Robert R. Niccolini.

Siobhan M. Kelly, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Arthur F. Rosenfeld, General Coun-

sel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick C. Havard, Supervisory Attorney.

Before: SENTELLE and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge WILLIAMS.

WILLIAMS, Senior Circuit Judge:

Sasol North America, Inc. (formerly known as Condea Vista Chemical Co.) appeals from the National Labor Relations Board's ruling that it violated various provisions of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The charge: that Sasol, inspired by anti-union animus, had unilaterally (i.e., without affording the union an opportunity to bargain) abandoned an unwritten policy allowing unlimited unpaid leave for union leaders to work on union business. The Board found both anti-union animus and refusal to bargain. See *Condea Vista Company,* 2000 NLRB LEXIS 813, 332 NLRB No. 117 (Nov. 16, 2000). In fact, however, the Board simply assumed its starting point—that Sasol had previously had a policy of unlimited leave, in the sense that the Board conceived it: leave at any time and in any amount, so long as the leave was taken for union activity. Additional errors followed. We therefore grant the petition for review, deny the cross-application for enforcement and remand for further proceedings.

\* \* \*

Sasol operates a chemical manufacturing facility in Lake Charles, Louisiana. Its workers are represented by the Paper, Allied Industrial, Chemical and Energy Workers International Union No. 4–555. The collective bargaining agreement explicitly provides that union leaders may take reasonable paid leave:

22–4 Worker's Committee and Stewards shall be permitted reasonable time to investigate, present, and process grievances on [Sasol] property during their regular working hours without loss of time or pay. Such time spent in handling grievances, or mutually agreed-upon Union business, during the Steward's alternate's or Worker's Committee's regular working hours shall be considered working hours in computing daily and/or weekly overtime if within the regular schedule of the employee.

Though there is no provision in the CBA relating to unpaid leave for union activities, such leave was commonly taken pursuant to an unwritten policy (the exact nature of which is at issue).

This case was precipitated in April 1998, when Daren Appleby, president of Local No. 4–555 and a plant operator (as both parties describe him, though without explanation of his responsibilities), filed a grievance complaining that he had not received adequate training. Appleby's supervisors responded that Appleby had failed to receive training simply because he was so often absent from work.

That claim gave rise to an internal investigation, finding that Appleby had taken unpaid union leave from about 36% of his scheduled work periods between January and October of 1998; the ultimate figures for all of 1998 showed that he missed 35% of his work periods for unpaid leave and an additional 9.5% because of vacation and sick days.

This prompted Sasol to crack down on Appleby's liberal use of unpaid leave. In a letter dated October 30, 1998, Jim Ely (Sasol's Human Resources Administrator) admonished Appleby that "36% absence for off-property Union business is too much and we expect to approve less of this type in the future." Ely went on to say,

"We will approve a reasonable amount of Union business time for on-site Union business as specified in Article 22–4, as possible given the nature of Operations and Maintenance work here at CONDEA Vista, and only with prior approval of each Committeeman's immediate supervisor."

In December of 1998, Appleby met with three Sasol managers: Chris Turner, Mike Glackin, and Jim Ely. The managers all testified that Turner brought up the issue of unpaid leave, and Appleby responded that he did not have to talk about that issue. Appleby himself, when asked if anything was said at the meeting about unpaid leave, first said, "I don't recollect," but went on to deny that he had refused to discuss excessive unpaid leave.

Sasol followed up the October 1998 letter with one sent on February 26, 1999 from Jim Ely to Appleby. The letter said:

As stated previously, we will no longer be able to provide this large amount of excused time for off-property Union-related matters. The need to operate the plant efficiently and for all employees to stay currently trained on their job requires that all employees attend work regularly.

Effective March 15, 1999, we will administer Article 22–4 as written. There is no provision in 22–4 for excused time off for Union-related matters off Company property.

We will approve a reasonable amount of on-site Union business time for Worker's Committee members and Stewards as specified in Article 22–4, as possible, upon advanced request, with a general description of what the time is needed for, to the employee's immediate Supervisor.

Characterizing this as a change in company policy, the union replied on March 4, 1999, requesting that Sasol meet and bargain. Sasol manager Chris Turner responded March 10, saying: "With respect to your alleged demand for bargaining over this 'change,' no change is being implemented. To the contrary, the Company is simply applying Article 22–4 as written."

An increasingly acrimonious series of letters followed between Appleby and various Sasol managers. Perhaps from a change of heart (or perhaps fearing impending litigation), Human Resources Manager Mike Glackin wrote Appleby on June 29, 1999, offering to bargain with the union over the issue of unpaid leave. By this point, however, Appleby had apparently lost interest in bargaining, and chose instead to file unfair labor practice charges with the Board. After a hearing in January 2000, the ALJ held that Sasol had violated §§ 8(a)(1), (3), and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1), (3), (5). See *Condea Vista Company*, 2000 NLRB LEXIS 813, at *7, 332 NLRB No. 117 (Nov. 16, 2000) (reprinting ALJ's decision).

The ALJ first found that Sasol's "policy before October 1998 was to grant unpaid leave for Union business away from its plant." 2000 NLRB LEXIS 813, at *15–*16. The ALJ chose to discredit (apparently as hearsay) Jim Ely's testimony that company supervisors had in the past denied requests for unpaid union leave. *Id.* at *27.

The ALJ then found that Sasol's change in this policy was motivated by anti-union animus, a violation of §§ 8(a)(3) and (1) of the NLRA, 29 U.S.C. §§ 158(a)(3), (1). *Id.* at *22. The ALJ relied mainly on testimony by Gary Beevers, an international union representative. Beevers testified that in an April 1999 meeting with Mike Glackin and Jim Ely, Glackin had said that the suspension of unpaid union leave was because Appleby "was using that leave to prepare untrue Union leaflets ... and frivolous complaints with the NLRB and nu-

merous data demands." *Id.* \*16–\*17, \*20–\*21. Glackin denied this version of their meeting, but the ALJ credited Beevers's testimony, apparently relying substantially on Glackin's notes of the meeting. *Id.* at \*16–\*17.

Sasol offered a defense under *Wright Line,* 251 NLRB 1083 (1980), enf'd 662 F.2d 899 (1st Cir.1981), saying that it would have taken the same action regardless of any alleged anti-union animus. It reasoned that Appleby's extended periods of absence were an "abuse" of the unpaid leave policy, and that such absences resulted in a lack of adequate job training, thus threatening the safety of operations at Sasol's plant. The ALJ, however, reconceived the concept of "abuse" as limited solely to whether Appleby's union leaves had been for personal business, *id.* at \*21–\*22, evidently assuming that Sasol could not regard leave as "abusive" merely because it prevented the worker from performing necessary functions (here, as Appleby's grievance had highlighted, attending safety training). Having so narrowed the abuse inquiry, the ALJ concluded that Sasol failed to establish its *Wright Line* defense. *Id.* at \*22.

The ALJ then found that Sasol had violated § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), by failing to bargain with the union before changing its unpaid leave policy. *Id.* at \*22–\*23 (citing *NLRB v. Katz,* 369 U.S. 736, 745–47, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1963)). In reaching this conclusion it held that neither of the two main exceptions to a company's duty to bargain was present in this case: the union's use of dilatory tactics to avoid bargaining, or economic exigencies demanding immediate action. *Id.* at \*28–\*29 (citing *International Paper Company,* 319 NLRB 1253, 1273–74 (1995)).

Following the filing of exceptions by both parties, the Board adopted the ALJ's decision in full. *Condea Vista Company,* 2000 NLRB LEXIS 813, 332 NLRB No. 117 (Nov. 16, 2000). In addition, the Board noted that Mike Glackin had allegedly told Gary Beevers that unpaid leave was to be canceled in part because of the union's "frivolous complaints with the NLRB." Because there was no evidence of any frivolous complaints, the Board found that Sasol had violated § 8(a)(4), 29 U.S.C. § 158(a)(4) (penalizing discrimination "against an employee because he has filed charges ... under this subchapter"). *Id.* at \*2 n. 4.

\* \* \*

We think that the Board erred on three crucial issues: whether Sasol changed its unpaid leave policy; whether Sasol acted out of anti-union animus; and whether Sasol presented a valid *Wright Line* defense.

██ The Board maintains that before the Appleby episode Sasol allowed unlimited unpaid leave, which is why it required Sasol to post a notice saying that it would not "change our policy of granting unlimited unpaid leave...." 2000 NLRB LEXIS 813 at \*38. And the Board's lawyer at oral argument admitted that, in the Board's eyes, Sasol's policy would have allowed a union official to spend *95% of his working time* tending to union affairs.

Not only is there no substantial evidence to support this interpretation of Sasol's unpaid leave policy, there is no evidence whatever in the record before us. The Board relied on the fact that Appleby took a "substantial amount of unpaid leave for union business during 1997 and 1998." But Sasol tried to limit Appleby's leave to something more reasonable as soon as his extended absences came to its attention; the mere fact that Appleby got away with lavish leave for a year or so does not

establish that there was ever a general *policy* of unlimited leave.

The Board argues that Sasol had never before claimed that a "union official had abused the policy by taking too much unpaid leave." Respondent's Br. at 19. But, as the Board's lawyer admitted, there is no evidence that any other union official ever tried to take 36% of his time in unpaid leave. It is hard to imagine that a rational firm would ever, absent very substantial concessions by the union, agree to a leave policy as unlimited as the Board assumed. To assert that Sasol had a policy of unlimited leave requires at least some evidence—and the Board has none.

One might think that even if the leave policy had been short of "unlimited," Sasol might be liable for a unilateral change if, without bargaining, it *eliminated* unpaid leave altogether. But the evidence on Sasol's conduct is unclear, and neither the ALJ nor the Board ever found that Sasol changed from a policy of reasonable unpaid leave to none at all. It is questionable whether substantial evidence would support any such finding.

Sasol's letter of February 26, 1999—which the Board's brief characterizes as having "terminate[d]" unpaid leave—never even refers to a distinction between paid and unpaid leave. Rather, it says that Sasol will no longer provide leave for "matters *off Company property*"—apparently whether paid or unpaid. Instead, "Effective March 15, 1999, we will administer Article 22–4 as written." The effect of this statement on unpaid leave is murky, since Article 22–4 doesn't mention unpaid leave at all. Sasol might have meant that since Article 22–4 is silent on unpaid leave, it would henceforth never permit such leave. Alternatively, it might have meant that unpaid leave would be limited by a criterion of reasonableness—as Article 22–4 provided in the case of paid leave. Sasol

(through its lawyer and its managers' testimony) seemed generally to have envisioned a policy of reasonable unpaid leave, consistent with the latter reading. See, e.g., Joint Appendix 18, 19, 82, 101, 116, 134–36, 161, 270–71, 510; but compare *id.* 52, 71, 91, 92, 98, 99, 100, 109, 263.

Indeed, one of Sasol's exceptions to the ALJ's ruling was that the ALJ failed "to find that the reasonable limitations placed upon unpaid union leave by Condea Vista mirrored and tracked the reasonable limitations placed on paid union leave pursuant to Section 22–4...." Absent a finding on the point supported by substantial evidence, we cannot affirm the Board's order on an assumption Sasol actually *changed* its unpaid leave policy, as opposed to merely *enforcing* a pre-existing reasonableness criterion.

■ Next, we think the Board erred in its conclusion that Sasol acted out of anti-union animus. The evidence for this conclusion is paltry at best. The ALJ first relied on Jim Ely's October 30, 1998 letter saying that Appleby's leave time was " 'too much and we expect to approve less of this type in the future.' " After quoting this letter, the Board states that "Appleby and other Union officials were engaged in protected activity when handling Union business." *Condea Vista,* 2000 NLRB LEXIS 813, at *20. Though no argument is spelled out here, the implication is that because Appleby was taking time off for union activities, Sasol could have no motivation for limiting his leave other than to curtail the union activities. But this would make sense only on the Board's assumption that Sasol had a policy of totally unconstrained union leave—an assumption without any basis. Just as an employee cannot "shield himself from all possibility of termination merely by becoming a union activist," *Synergy Gas Corp. v. NLRB,* 19 F.3d 649, 652 (D.C.Cir.1994), neither can a

union official—absent a bargain to that effect—shield himself from ever having to show up for work merely by conducting union business. And, as we discuss in more detail below, Sasol made it clear on numerous occasions—both in discussions with the union and in testimony before the ALJ—that it thought Appleby's continued absences were unreasonable.

The second (and last) piece of evidence for anti-union animus is an account of the April 1999 meeting between Mike Glackin, Jim Ely, and international union representative Gary Beevers. As noted above, Beevers testified that Glackin said that the unpaid leave policy was to be revoked because Appleby had used his time off to prepare untrue union leaflets, frivolous complaints with the NLRB, and numerous data demands. Glackin, for his part, said that "Mr. Beevers either made an untrue statement, or Mr. Beevers clearly misunderstood something that I said." The ALJ resolved the conflict in favor of Beevers, explaining that Glackin's own handwritten notes of the meeting "tend to support the testimony of Beevers." *Condea Vista,* 2000 NLRB LEXIS 813, at *17, *21. This support allegedly comes from two sentences in the Glackin notes: "I pointed out the examples of the Union grieves and arbitrates every issue, that they have filed numerous info requests which are frivolous and harassment...." and "I further mentioned a charge that Jim Ely had threatened the lives of Ray Reynolds and his family and then would not allow me to properly investigate the charges, is another example of *the Union* not Mgmt. straining the possibility of establishing a better working relationship." J.A. 507, 508; 2000 NLRB LEXIS 813 at *17.

■ But the ALJ's use of the Glackin notes was palpably defective. The two statements relied on by the Board appear in the part of Glackin's notes describing his and Beevers's discussion of the union/management relationship in general, *not* the leave policy. J.A. 507–08. Two pages later the notes recount the parties' discussion of unpaid leave. They report that Glackin told Beevers that the issue arose because Appleby filed a grievance for insufficient training, and Appleby's supervisors said that "he's never here @ work and they have a big concern about him keeping current...." J.A. 509. Thus, contrary to the ALJ's view, Glackin's notes do not support the idea that he told Beevers that the leave policy was changed because of objections to the *content* of union activity. In context, the two statements recorded by Glackin do not even remotely constitute evidence of a "threat of reprisal or force or promise of benefit," 29 U.S.C. § 158(c); under that provision, therefore, they cannot be used as "evidence of an unfair labor practice under any of the provisions" of the NLRA. *Id.*; see also *Medeco Security Locks, Inc. v. NLRB,* 142 F.3d 733, 744 (4th Cir.1998); *BE & K Constr. Co. v. NLRB,* 133 F.3d 1372, 1375–77 (11th Cir.1997); *Holo-Krome Co. v. NLRB,* 907 F.2d 1343, 1345–47 (2d Cir.1990); *Ross Stores, Inc. v. NLRB,* 235 F.3d 669, 676 (D.C.Cir.2001) (Henderson, J., concurring). While an agency's credibility decision normally enjoys almost overwhelming deference, it does not do so when it rests explicitly on a mistaken notion. See, e.g., *United States ex rel. Exarchou v. Murff,* 265 F.2d 504, 507 (2d Cir.1959) (agency credibility decision reversible where based simply on mistaken view of the story's plausibility).

■ Given the Board's mistaken understanding of the Company's unpaid leave policy and its misplaced reliance on Glackin's notes, its finding that Sasol's policy was driven by antiunion animus is unfounded. See *Southwest Merchandising Corp. v. NLRB,* 943 F.2d 1354, 1361

(D.C.Cir.1991) (Board failures in reasoning prevent review for substantial evidence).

■ Finally, we find no justification for the short shrift the ALJ gave Sasol's *Wright Line* defense—its argument that it would have taken the same action (whether characterized as change or as enforcement) regardless of any alleged anti-union animus. The ALJ treated this solely as a claim that Appleby was using his union leave for personal rather than union business. 2000 NLRB LEXIS 813 at *21. Sasol did raise that narrow claim, and we'll assume the ALJ's rejection was supported. But Sasol also raised the general point that Appleby's lengthy absences constituted an "abuse" of its policy, see J.A. 91, 99, 113, 125–26, 158, 165, 174–75, and the specific argument that the extended absences caused a lack of current training, in turn leading to increased safety risks, see, e.g., J.A. 113, 160, 166. Sasol's February 1999 letter made the point explicitly, asserting the "need to operate the plant efficiently and for all employees to stay currently trained on their job [sic]." Again, we need not decide on the validity of these "obvious alternative explanations," *Southwest Merchandising Corp.*, 943 F.2d at 1361, as the Board never even considered them. The *Wright Line* defense is therefore yet another issue the Board must consider on remand. Cf. *McQuaide, Inc. v. NLRB*, 133 F.3d 47, 50 (D.C.Cir.1998). Of course, "[t]he weaker a prima facie case against an employer under *Wright Line*, the easier for an employer to meet his burden ... of proving that the [employer's action] would have occurred regardless of the protected activity." *Doug Hartley, Inc. v. NLRB*, 669 F.2d 579, 582 (9th Cir.1982).

Finally, we cannot sustain the Board's finding that Sasol violated 29 U.S.C. § 158(a)(5) by failing to bargain before "changing" the unpaid leave policy. Because it is impossible to say whether there was substantial evidence of any such change, it is premature to consider the issue of breach of the duty to bargain.

\* \* \*

We grant the petition for review, deny the cross-application for enforcement, and remand the case to the Board for further proceedings consistent with this opinion.

*So ordered.*