# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 6, 2025        Decided September 5, 2025

No. 24-1104

COMPANIA CERVECERA DE PUERTO RICO, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 24-1187

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Giovanna P. Moreno-Lopez* argued the cause for petitioner. With her on the briefs was *Maria D. Trelles-Hernandez*.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief

were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: RAO and CHILDS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

Dissenting opinion filed by *Circuit Judge* RAO.

CHILDS, *Circuit Judge*: The National Labor Relations Board determined that Compañía Cervecera de Puerto Rico (Cervecera or the employer) violated sections 8(a)(1), (3) and (5) of the National Labor Relations Act (the Act) by: taking an adverse and retaliatory employment action against the president of the Unión Independiente de Trabajadores de Cervecería India (the Union), changing a mandatory subject of bargaining while negotiations for a successor collective bargaining agreement (CBA) were ongoing, and implementing a final offer on work schedules in the absence of a good-faith impasse. The employer petitions for review of that decision and the Board cross-applies for enforcement of its decision and order. Because the Board's determinations and findings are supported by substantial evidence and are not otherwise reversible error, we deny the employer's petition for review and grant the Board's cross-application for enforcement of its decision and order.[1]

---

[1] Our colleague would grant the petition based on her view that the Board's findings are unsupported by substantial evidence and misinterpret the CBA.

3

**I.**

**A.**

The employer is a brewing and bottling company based in Puerto Rico. From its facility in Mayaguez, Puerto Rico, the employer ships beer to customers on the island and elsewhere in the United States. The employer planned to further expand its sales outside of the island. To do so, it sought a steady output stream that it believed could be supplied only by a facility that ran 24 hours a day, 7 days a week.

The employer's expansion plans, however, hit a roadblock: its CBA with the Union. The employer has approximately 220 employees, and around 120 of those employees form a collective bargaining unit represented by the Union. For over thirty years, the employer and the Union ("the parties") successfully negotiated CBAs. They last signed an agreement in 2018 (the 2018 CBA). Under the terms of the 2018 CBA, bargaining-unit employees generally worked five days, forty hours per week, and were not typically required to work on Saturdays or Sundays. But that work schedule did not appear to allow the employer to keep its facility running continuously. Indeed, since 2018, the employer periodically hired temporary staff to fill gaps in its schedule when around-the-clock production was necessary.

The negotiations for a successor CBA offered the parties an opportunity to bargain for a new work schedule that could meet the employer's expansion needs. The 2018 CBA was set to last until September 2021, but the parties extended it to December 2021 and then to January 2022. The parties held their first bargaining meeting in July 2021 and later adopted negotiation rules. Early on in their negotiations, the employer made clear that changing the work schedule was a priority.

4

Soon after the parties began bargaining, the employer tried to force its preferred work schedule on the Union. Instead of negotiating a new schedule, the employer sought to compel the bargaining unit's employees to work six consecutive workdays, which its human resources manager later conceded was contrary to Article 27 of the still-active 2018 CBA. That schedule allowed the employer to meet the operational needs of its expansion plans. But it also deprived all Union employees from guaranteed leave on weekends. The Union pushed back and filed a charge with the Board, alleging that the employer's attempted imposition of an altered work schedule was an unfair labor practice.

Before the Board adjudicated that charge, the parties reached a settlement agreement in March 2022. Under that agreement, the employer committed to compensate the impacted employees. In return, the Union agreed to temporarily adopt, until June 30, 2022, the same six-day work schedule the employer had tried to impose on the employees.

About a month after entering the settlement agreement, the employer placed the Union President, Abel Luciano, on an unpaid leave of absence. Under Article 34 of the 2018 CBA, the Union President—who is also a full-time employee—may annually take up to 200 work hours of paid leave for Union business. At the time he was placed on leave, the Union President had taken 203 hours. Article 34 provides, in relevant part, that "[s]hould there be a need for greater time," the Union President "shall request a prolonged leave without pay, no less than six months." J.A. 747.[2] The Union President did not indicate he needed additional leave for union matters and did

---

[2] The 2018 CBA was written in Spanish. The Board found and the parties now agree that "shall request a prolonged leave" is a proper translation of the relevant provision in Spanish.

not request prolonged leave before the employer placed him on unpaid leave. In a prior contract year governed by the 2018 CBA, the employer had not placed the Union President on unpaid leave even though he exceeded 200 hours.

Even as the employer attempted to impose its preferred work schedule on the employees and placed the Union's president on unpaid leave, the parties pressed on with their negotiations. Although they had originally planned to address each CBA article in numerical order, the Union suggested and the employer agreed to prioritize negotiations over Article 27, which addressed work schedules. Between November 2021 and June 2022, the parties exchanged proposals on that provision.

By June 2022, the parties had not reached an agreement regarding work schedules. Under the terms of the settlement agreement, at the end of the month, the bargaining unit employees would return to the 2018 CBA's work schedule, which did not allow for continuous production. On June 21, 2022, the employer submitted its "final proposal" on Article 27. J.A. 751. That offer would have required employees to forego guaranteed weekend leave. The Union rejected the final offer and responded with a counterproposal, which preserved weekend leave for most employees and created a designated shift of weekend employees.

The employer responded by informing the Union that it believed they had reached an impasse on Article 27 and by urging the Union to "accept the Company's last, best[,] and final offer." J.A. 751; *see also* J.A. 502. The Union disagreed, stressing that it had shown interest in moving the collective bargaining forward and calling on the employer to reconsider its declaration of impasse and resume negotiations. The employer then implemented its final offer on Article 27. That

final offer allowed the company to operate its facility around the clock.

After the employer declared an impasse on Article 27, the parties negotiated other aspects of the CBA. On the same day that the employer notified the Union that it would implement its final offer on Article 27, the Union and the employer exchanged proposals on Articles 8 and 19.

**B.**

The Union filed new charges against the employer with the Board. Following a three-day hearing, at which the employer's human resources manager testified, an Administrative Law Judge (ALJ) determined that the employer had engaged in three unfair labor practices. First, by placing the Union President on unpaid leave in retaliation for his protected union activities, the employer violated sections 8(a)(1) and (3) of the Act. Second, by placing the Union President on unpaid leave in the absence of a request by him, the employer unilaterally changed the terms for union leave—a mandatory subject of bargaining— that it was required to preserve after the 2018 CBA expired, in violation of sections 8(a)(1) and (5) of the Act. And third, by implementing its final offer on work schedules without reaching an impasse, the employer violated sections 8(a)(1) and (5) of the Act. A three-member panel of the Board affirmed the ALJ's rulings, findings, and conclusions. The employer then filed this petition for review, and the Board cross-appealed for enforcement of its order.

**II.**

We have jurisdiction over the employer's timely petition for review of the Board's final order and the Board's cross-application for enforcement. 29 U.S.C. § 160(f). "Our review

of the Board's unfair labor practice decisions is tightly cabined, and we afford the Board a high degree of deference." *Absolute Healthcare v. NLRB*, 103 F.4th 61, 67 (D.C. Cir. 2024) (quotations and citation omitted). We uphold the Board's determinations "unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (quotations and citations omitted). We will not disturb the Board's findings of fact "if supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e), and "we may not displace the Board's choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us *de novo*." *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 306 (D.C. Cir. 2003) (quotations and citation omitted). "An ALJ's credibility findings contribute to substantial evidence unless hopelessly incredible, self-contradictory, or patently insupportable." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 484 (D.C. Cir. 2020) (quotations and citations omitted). We review the Board's interpretation of contracts *de novo*, applying "ordinary principles of contract law" and deferring "to the Board's fact-finding . . . necessary to interpret the meaning of the contract." *Pac. Mar. Ass'n v. NLRB*, 967 F.3d 878, 885 (D.C. Cir. 2020) (quotations and citations omitted).

**III.**

We first consider the Board's determination that the employer engaged in an unfair labor practice by placing the Union President on unpaid leave in retaliation for his union-related activities. An employer violates both sections 8(a)(3) and (1) of the Act "by taking an adverse employment action . . . in order to discourage union activity." *Ozburn-*

*Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 217 (D.C. Cir. 2016) (quotations and citation omitted). For such a violation to exist, the Board must make both "a predicate determination that an employer took an adverse action" against an employee, *Bellagio, LLC v. NLRB*, 854 F.3d 703, 709 (D.C. Cir. 2017), and a subsequent determination that the adverse action was motivated by anti-union animus, *Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 40 (D.C. Cir. 2020). The employer contends that the Board erred in determining that placing the Union President on unpaid leave was an adverse employment action and that such an action was motivated by anti-union animus. We disagree with the employer's contentions.

**A.**

We start with the Board's threshold determination that the employer's decision to place the Union President on unpaid leave was an adverse action. "Adverse acts are those that reduce a worker's prospects for employment or continued employment, or worsen some legally cognizable term or condition of employment." *Bellagio*, 854 F.3d at 709. The employer unilaterally placed the Union President on unpaid leave and denied him wages during that leave. This action had "a negative impact on [Luciano's] employment situation or job prospects." *Id.* at 710; *see also Ne. Iowa Tel. Co.*, 346 NLRB 465, 475 (2006) ("Certain . . . employment actions are 'adverse' because they change the terms and conditions of employment in an unfavorable way and . . . [a] reduction in pay certainly constitutes a change for the worse.").

The employer counters that it took no "action" at all, since the Union President's unpaid leave was automatically triggered as soon as he exceeded the 200-hour limit. But the record shows that placing the Union President on leave required the employer to make an affirmative decision. In contract year

2020-21, after it notified the Union President that he had exceeded the 200-hour limit and after the Union President took additional leave hours despite that notice, the employer did not place the Union President on unpaid leave as it sought "to keep the good employer-employee relations at that time." J.A. 748; *see also* J.A. 199.

The employer further contends that its decision to place the Union President on leave was not adverse because it was authorized by the CBA and because it could have pursued a more punitive action by terminating the Union President for "continued . . . violations to [the employer's] norms and policies." Pet'r's Br. 39. What defines an adverse action, however, is whether it causes a "negative impact" on an employee's conditions of employment. *Bellagio*, 854 F.3d at 710. Our dissenting colleague suggests that the employer "acted with leniency" because it chose forced leave over terminating the Union President. Dissent at 10. However, disciplinary actions authorized by a CBA and actions that are less punitive than an alternative can still be adverse if they have a negative impact on an employee's conditions of employment.

The employer made a decision to place the Union President on leave. And that decision harmed the Union President's conditions of employment. The Board, therefore, did not err in determining that the employer took an adverse employment action against the Union President.

## B.

We next turn to the Board's determination that the employer's action was motivated by anti-union animus. To assess an employer's motivation for an adverse action, the Board applies the *Wright Line* test. *See Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981).

The *Wright Line* test proceeds in two stages: first, the General Counsel must make a *prima facie* case that the adverse action was motivated by anti-union animus; and second, the burden shifts to the employer to show it would have taken the same action in the absence of unlawful motive. *See Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125–26 (D.C. Cir. 2001). We consider and affirm the Board's findings at each stage of the *Wright Line* test.

**1.**

At the first stage of the *Wright Line* test, the Board's General Counsel must demonstrate that the employee was engaged in a protected union-related activity, that the employer was aware of that protected activity, and that the protected activity was a motivating factor in the employer's decision to take an adverse action against the employee. *Inova*, 795 F.3d at 80. We afford the Board's finding of anti-union motivation a "very high degree of deference," *Hosp. de la Concepcion v. NLRB*, 106 F.4th 69, 76 (D.C. Cir. 2024) (quotations and citation omitted), "because most evidence of motive is circumstantial," *Acumen Cap. Partners v. NLRB*, 122 F.4th 998, 1003 (D.C. Cir. 2024) (quotations and citation omitted). Circumstantial evidence of improper motive may include other anti-union actions by the employer and the timing of the adverse action. *See Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1101 (D.C. Cir. 2019); *see also Tasty Baking*, 254 F.3d at 125–26. The Board did not err in finding that the General Counsel satisfied the first stage of *Wright Line*.

The Board correctly found that the Union President was engaged in a protected activity and that the employer was aware of his engagement. Under *Wright Line*, "protected activity" includes "activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

The Union President engaged in protected activity when he participated in negotiations for a successor CBA and in negotiations over the settlement agreement addressing the employer's attempted schedule change. And the successor CBA negotiation rules as well as the settlement agreement informed the employer that the Union President represented the Union in the relevant negotiations.

The Board's finding that the employer's adverse action against the Union President was motivated by anti-union animus is supported by substantial evidence—specifically, the employer's prior actions showing anti-union animus and the temporal proximity between the settlement agreement addressing those actions and the employer's decision to place the Union President on unpaid leave in the absence of a request for additional union hours.

*First,* the employer's conduct during the CBA negotiations, including its unilateral change to the employee schedule, evinced anti-union animus. *See, e.g., Frazier Indus. Co., Inc. v. NLRB*, 213 F.3d 750, 756 (D.C. Cir. 2000) ("[E]vidence that an employer has [committed unfair labor practices] can support an inference of anti-union animus.") (*citing Parsippany Hotel Mgmt. v. NLRB*, 99 F.3d 413, 424 (D.C. Cir. 1996). A month into negotiations for a successor CBA, the employer unilaterally changed the employees' work schedule. By the employer's own admissions, the modified work schedule was a material departure from the existing CBA and the work schedule was one of the critical issues in the parties' negotiations. J.A. 749. The Union, led by the Union President, pushed back by filing a charge with the Board. The employer and the Union, represented by the Union President, then engaged in protracted settlement negotiations.

*Second*, the temporal proximity—only one month—between the settlement agreement in March 2022 and the employer's decision to place the Union President on unpaid leave in April 2022 further supports a finding that anti-union animus motivated the employer's adverse action. "As a general principle, the timing of an employer's adverse action can shed light on its causes." *Stern Produce Co., Inc. v. NLRB*, 97 F.4th 1, 14 (D.C. Cir. 2024) (citation omitted); *see also Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1283 (D.C. Cir. 1999) ("[T]iming is a telling consideration in determining whether employer action is motivated by anti-union animus."). The employer placed the Union President on unpaid leave less than one month after the employer reached a settlement agreement with the Union. Prior to the settlement agreement, the employer gave the Union President no advance notice that it would or could place him on unpaid leave without receiving a request. The close timing between the two events supports the Board's finding that the employer "seized upon [an] available opportunity . . . to retaliate against" the Union President for his role in representing the Union's interests during the settlement negotiations. *Stern Produce*, 97 F.4th at 14 (cleaned up).

The employer responds that the Board erred by relying on the settlement agreement as evidence of animus because, by doing so, the Board irrationally assumed the employer was opposed to a settlement agreement, reopened a settled unfair-labor-practice charge, and departed from precedent barring its consideration of settlement agreements as evidence of anti-union animus. The employer misapprehends the focus of the Board's inquiry. The Board relied on admissions by the employer's human resources manager that the employer changed the work schedule in July 2021 and that the parties entered a settlement agreement to resolve the dispute that followed that change. The Board did not examine the Union's settled charge against the employer, it did not make any

findings regarding the merits of that early charge, and it did not evaluate the terms of the settlement agreement. Furthermore, consistent with its precedent, the Board did not rely exclusively on the settlement agreement to establish animus. *See Sw. Chevrolet Corp.*, 194 NLRB 975, 975 (1972) ("The Board has uniformly held that settlement agreements . . . have no probative value in establishing that violations of the Act have occurred and may not be relied on to establish . . union animus."). The Board, instead, identified the employer's presettlement conduct as evidence of anti-union animus. *See Host Int'l Inc.*, 290 NLRB 442, 442 (1988) (finding an employer's "presettlement conduct may properly be considered as background evidence" of animus). And that presettlement conduct further showed that even if the employer viewed the settlement agreement as a "positive development," Pet'r's Reply Br. 15, the agreement was preceded by protracted settlement negotiations.

Since the Board's finding of animus relied on the human resources manager's testimony, the employer further objects to the Board's credibility determinations relating to her testimony. The employer disagrees with the Board's crediting of portions of her testimony and discrediting of other portions of her testimony. The employer argues that the manager was subject to prolonged, hostile and confusing examination, that the manager lacked expertise, that the manager was asked questions for which she was unprepared, and that there were difficulties with translation. But raising only broad generalizations, the employer has not shown that the Board's credibility determinations are "hopelessly incredible, self-contradictory, or patently insupportable" as to warrant reversal. *Hood River Distillers, Inc. v. NLRB*, 130 F.4th 204, 212 (D.C. Cir. 2025) (quotations and citation omitted).

The employer further contends that the Board should have drawn an adverse inference from the General Counsel's failure to call the Union President to testify.  Pet'r's Br. 60-61.  The adverse inference rule "provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union (UAW) v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972).  The Board has adopted the adverse inference rule, noting that "it is settled that when a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge." *Daikichi Corp.*, 335 NLRB 622, 622 (2001) (quotations and citations omitted). An adverse inference is specific to a particular disputed fact and cannot be "tantamount to a directed verdict" or resolution of the whole dispute. *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 28 (D.C. Cir. 2013).   The employer, by contrast, appears to suggest that the Board should have drawn a sweeping adverse inference relating to "all the facts alleged in the Complaints" because "the General Counsel failed to present the [Union president's] testimony regarding both charges despite his incontestable personal knowledge of all the facts."  Pet'r's Br. 60.

Even if the employer has properly presented an objection to the Board's failure to draw an adverse inference, it is without merit. The Board is not required to draw an adverse inference from a party's failure to call a witness where, as here, the party has otherwise presented sufficient evidence of violations.  *See Int'l Union*, 459 F.2d at 1344 ("[W]here a party has good reason to believe he will prevail without introduction of all his evidence, it would be unreasonable to draw any inference from a failure to produce some of it").  And we see no reason to otherwise find that the Board abused its discretion to decline to

draw an adverse inference from the absence of testimony by the Union's president. *See Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 266 n.1 (D.C. Cir. 1998) ("[T]he decision of whether to draw an adverse inference has generally been held to be within the discretion of the [Board as the] fact finder.").

Nor is there merit to the employer's argument that the Board should have not only drawn an adverse inference from the General Counsel's failure to call the Union President but should have also afforded the human resources manager's testimony "absolute credibility" on account of that adverse inference. Pet'r's Br. 60–61. The employer's argument contradicts its own contention that the Board should have found that parts of the human resources manager's testimony were not credible. Pet'r's Br. 53–56. The employer does not, and could not, offer any support for the sweeping proposition that the Board would have been required to find testimony by one party's witness absolutely credible if it had drawn an adverse inference based on another party's failure to offer testimony by another witness.

Because the employer's other anti-union actions and temporal proximity to the settlement agreement provide substantial evidence that placing the Union President on leave was animated by animus, we do not consider whether other evidence in the record could support a finding of retaliatory motive. In finding animus, the Board also considered whether the decision to place the Union President on leave was a departure from its practice in the preceding contract year. The employer objects to the Board's reliance on a single year—out of a bargaining relationship of over thirty years—to identify a break with past practice showing animus. We need not and do not address the merits of this objection. "The record as a whole" provides substantial evidence for the Board's finding

of animus. *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011).

**2.**

At the second stage of the *Wright Line* test, "the burden shifts to the [employer] to show that it would have taken the same action in the absence of the unlawful motive." *Tasty Baking*, 254 F.3d at 126. The Board's finding that the employer did not meet its burden is supported by substantial evidence and is not reversible error.

The employer argues that in placing the Union President on unpaid leave it merely enforced the terms of Article 34 of the 2018 CBA.[3] That provision, however, did not require or authorize the employer's action. In relevant part, Article 34 provides: "Should there be a need for greater time, the employee shall request a prolonged leave without pay." J.A. 747. Article 34's plain language does not provide the employer with clear authority to unilaterally impose unpaid prolonged leave. Instead, the conditional clause—should there be a need for greater time—combined with the subsequent clause—that an employee "shall request" prolonged leave if there were such a need—indicates that the Union President must first assess whether additional time is necessary and then file a request. The Union President could decide that greater time is not necessary, could postpone further union activity until the next contract year, or could elect to use alternative forms of leave like vacation time. Without receiving an explicit request, the employer cannot force the Union President to go on unpaid

---

[3] The employer justifies its decision to place the Union President on leave only on Article 34. The employer does not claim that it placed the Union President on leave as a disciplinary action authorized by any other provision of the CBA.

leave once the 200 hours are exhausted. Nor does Article 34 require that, under any circumstances, the employer place the Union President on leave as soon as he exceeded 200 hours. The employer's implementation of Article 34 during contract year 2020-21, urging the Union President to request extended leave, did not automatically extend the Union leave period, and its subsequent approval of such leave requests in excess of 200 hours undermines the employer's contention that the CBA "mandated" the Union president's leave. Pet'r's Br. 26.

Even if the 2018 CBA did authorize the employer's actions, it is the employer's burden to show not that it *could* have taken the same action pursuant to a CBA, but that "it *would* have taken the same action in the absence of the unlawful motive." *RAV Truck & Trailer Repairs, Inc. v. NLRB*, 997 F.3d 314, 325 (D.C. Cir. 2021) (emphasis added) (quotations and citation omitted). Aside from arguing that Article 34 authorizes its action, the employer offers no evidence that it would have placed the Union President on leave if not for animus. The employer, thus, did not meet its burden.

\* \* \*

Accordingly, the Board did not err in determining that the employer's decision to place the Union President on unpaid leave was an adverse action motivated by anti-union animus.

## IV.

Next, we consider the Board's determination that the employer engaged in an unfair labor practice when it placed the Union President on leave because, in so doing, the employer changed a mandatory subject of bargaining. "An employer violates [s]ection[s] 8(a)(5) and (1) if it makes a material,

substantial, and significant change regarding a mandatory subject of bargaining without first providing the union notice and a meaningful opportunity to bargain about the change to agreement or impasse, absent a valid defense." *Hosp. de la Concepcion*, 106 F.4th at 76 (quotations and citation omitted). Mandatory subjects of bargaining include "wages, hours, and other terms and conditions of employment," and may include the number of hours of leave an employee may take for union-related activities as well as the terms and conditions under which an employee may request such leave. *See* 29 U.S.C. § 158(d).

Although the employer placed the Union President on leave about three months after the 2018 CBA had expired, "[u]pon the expiration of a [CBA], the parties to that agreement have an ongoing obligation to maintain the status quo as to all mandatory subjects of bargaining until they reach a new agreement or an impasse." *Oak Harbor Freight Lines, Inc. v. NLRB*, 855 F.3d 436, 438 (D.C. Cir. 2017) (quotations and citations omitted); *see also NLRB v. Katz*, 369 U.S. 736, 743 (1962). To discern the post-expiration status quo, "we look to the substantive terms of the [expired] CBA." *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 374 (D.C. Cir. 2017). As "the Board has the primary responsibility of marking out the scope of the statutory duty to bargain," we afford "great deference" to the Board's determination that "a party has violated this statutory duty." *Pac. Mar. Ass'n*, 967 F.3d at 884 (cleaned up). The Board correctly found that the employer changed a mandatory subject of bargaining by unilaterally placing the Union President on leave and thereby departing from the terms for union leave set out by Article 34.

Whether the employer modified a mandatory subject of bargaining turns on the terms of the expired 2018 CBA. Article 34 of the 2018 CBA provided the Union President with the

option to "request" prolonged leave, "[s]hould there be a need" for the Union President to use additional work hours for union matters. J.A. 747. The employer argues that pursuant to Article 34 it was required or at least authorized to place the Union President on leave as soon as he had exceeded the 200-hour limit. Article 34's plain language, however, does not support the employer's position. By interpreting Article 34 to allow for the imposition of unpaid leave without receiving a request from the Union President—an interpretation barred by the express terms of the provision—and by then unilaterally placing the Union President on unpaid leave, the employer impermissibly modified the agreed-upon terms and conditions for union leave.

The employer's implementation of Article 34 in contract year 2020–21 indicates that it had not previously claimed the authority it now asserts to place the Union President on leave, in the absence of his request, as soon as he exceeded the 200-hour limit. By word and action, the employer showed that it understood the negotiated contract term required the Union President first submit a request. In contract year 2020-21, the employer alerted the Union President that he had used more than 200 hours and stated: "We urge you once again to request the extended union leave provided by the agreement for these purposes." J.A. 433. But the employer did not then suggest that under Article 34 it would or could impose unpaid leave if the Union President exceeded the 200-hour limit, instead urging the Union President to *request* further leave hours. And in that contract year, the employer did not ultimately place the Union President on unpaid leave even after he took twenty-eight hours beyond the 200-hour limit. By placing the Union President on leave in 2022 without receiving a request for unpaid leave, the employer not only departed from the Article 34's plain text but also from its own prior implementation of that provision.

Relying on *Sasol North America, Inc. v. NLRB*, 275 F.3d 1106 (D.C. Cir. 2002), the employer maintains that the Board erred in finding that it modified a mandatory subject of bargaining when it placed the Union President on leave and claimed to thereby enforce Article 34. In *Sasol*, we concluded that the Board erred in finding that the employer changed an unwritten leave policy, because the employer was merely enforcing an existing written policy. *Id.* at 1110–11. Under the relevant CBA, union officers could take "reasonable time" for union-related matters "on [the employer's] property." *Id.* at 1108. The CBA included "no provision . . . relating to unpaid leave for union activities." *Id.* Following an internal investigation that revealed that a union officer had taken 36% of scheduled work hours for off-property union matters, the employer in *Sasol* informed the union that it would enforce its written policy limiting union leave to "reasonable time" on the employer's property. *Id.* at 1108–09. The employer here contends that, like the employer in *Sasol*, it cannot be faulted for enforcing the CBA's union leave policy, even if it lapsed in its enforcement of the relevant provision during a single prior year.

*Sasol* does not support the employer's objection. Unlike the employer in *Sasol*, this employer did not seek to enforce a CBA provision that it had previously and unknowingly allowed employees to ignore without sanction. In contract year 2020-21, the employer was aware that the Union President had used more than 200 hours but did not seek to place him on leave by invoking Article 34. Nor did the employer then indicate that, pursuant to Article 34, it would or could place the Union President on leave after exceeding the 200 hours. Again, Article 34 explicitly specifies that the Union's president shall request unpaid leave if necessary. In *Sasol*, the employer sought to enforce the terms of the CBA after unknowingly acquiescing to a practice that was not contemplated by the

CBA. In explaining the holding in *Sasol*, our dissenting colleague observes that "the objective, written terms of [the] contract define the status quo." Dissent at 9 (citing 275 F.3d at 1111). Here, by contrast, the employer undertook an action that ran contrary to the relevant CBA provision and its prior implementation of that provision. In doing so, the employer changed the expired CBA's terms and conditions for union leave.

The Board's determination that the employer changed a mandatory subject of bargaining it was required to maintain after the 2018 CBA expired when it placed the Union President on unpaid leave and thereby departed from Article 34, thus, is supported by substantial evidence and is not reversible error.

**V.**

Lastly, we consider the Board's determination that the employer engaged in an unfair labor practice when it implemented its final offer on Article 27, because the parties had not yet reached an impasse. Section 8(a)(5) prohibits an employer from "refus[ing] to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). That bargaining obligation is suspended, however, when the parties reach a lawful impasse. *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 232 (D.C. Cir. 1996). "The party asserting impasse bears the burden" to show that an impasse existed. *Wayneview Care Ctr.*, 664 F.3d at 350. We "defer[] to the Board's fact-finding as to the existence of a bargaining impasse, . . . unless the finding is irrational or unsupported by substantial evidence." *Id.* at 348 (quotations and citations omitted).

Impasse on a single critical issue can excuse a party's bargaining obligation. To assess whether there is a single-issue

impasse, the Board applies the three-part *CalMat* framework. *See CalMat Co.,* 331 NLRB 1084, 1097 (2000). A party claiming a single-issue impasse must show that (1) the single issue involved was critical, (2) a good-faith bargaining impasse actually existed, and (3) the impasse over the single issue led to a breakdown in the overall negotiations. *See Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 21 (D.C. Cir. 2012). The parties agree that Article 27's work schedule provision was critical to the negotiations. But the employer disputes the Board's findings that the parties had not reached a good-faith impasse over Article 27 and that there was no overall breakdown in negotiations. Both findings are sound.

## A.

Whether the parties have reached a good-faith impasse is a "case-specific inquiry; there is no fixed definition of an impasse or deadlock which can be applied mechanically to all factual situations." *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001) (quotations and citation omitted). Relevant factors that the Board may consider include "the bargaining history, the good faith of the parties in negotiations, . . . and the contemporaneous understanding of the parties as to the state of negotiations." *Id.* (quoting *Taft Broad. Co.*, 163 NLRB 475, 478 (1967)). The Board properly considered the parties' bargaining conduct and contemporaneous understanding to find that they did not reach a good-faith impasse.[4]

---

[4] The Board also considered the parties' bargaining history, including "the parties' many years of negotiating agreements together," "the overall length of negotiations[,] and its preparation of over 10 proposals on Article 27," finding that a productive bargaining history was unable to "counter-balance . . . [the employer's] bad-faith conduct and the fact that the parties did not clearly believe there was an impasse." J.A. 759 (internal quotations omitted).

A good-faith impasse can "occur[] when '*good faith negotiations* have exhausted the prospects of concluding an agreement.'" *Id.* (emphasis added). "Good faith bargaining simply means a desire to reach an agreement," and an employer is "entitled to insist on certain terms." *Mike-Sell's Potato Chip Co. v. NLRB*, 807 F.3d 318, 324 (D.C. Cir. 2015). Still, the "parties must enter into discussions with an open mind and a sincere intention to reach an agreement." *United Steelworkers of Am. v. NLRB*, 983 F.2d 240, 245 (D.C. Cir. 1993) (quotations and citation omitted).

The record supports the Board's finding that the employer failed to engage in good-faith negotiations over Article 27 and did not therefore reach a good-faith impasse over that provision. From the onset of the negotiations, the parties recognized that Article 27 was going to be a critical issue. The Union was aware that the employer needed to change the work schedule to accomplish its expansion plans. Rather than negotiate in good faith, the employer "undermined the Union's bargaining position" over the work schedule. J.A. 759. Within weeks of starting negotiations, according to testimony by its human resources manager, the employer unilaterally changed the employee work schedule. The employer further disrupted the CBA negotiations by later placing the Union's president on unpaid leave. As the settlement agreement's June 30 deadline approached, after which the 2018 CBA's unfavorable work schedule would go back into effect, the employer declared an impasse. The employer did so despite the Union's requests to keep negotiating.

The contemporaneous understanding of both parties further supports the Board's finding that they did not reach a good-faith impasse. "An impasse occurs only when both sides have exhausted the prospects of reaching a deal . . . and neither side is open to compromise, leaving no realistic prospect that

further discussions will be fruitful." *Hood River Distillers,* 130 F.4th at 212 (cleaned up). The parties continued to exchange counterproposals on Article 27 up to the employer's impasse declaration. The Union's last response to the employer's final offer revisited a "previously abandoned" proposal that would have allowed the employer to fill its weekend needs by "hir[ing] new shifts of employees to work exclusively on Saturdays and Sundays." J.A. 751. The employer faults the Union for submitting a previously-rejected proposal, but does not contend or show that this counterproposal was offered in bad faith or was regressive. *Cf. Hood River Distillers*, 130 F.4th at 213 n.3, 214 (finding that the record did not show a union's last counterproposal was a regressive bargaining position as would support a good-faith impasse). Instead of reconsidering this prior proposal in light of later progress on other provisions, the employer rejected the Union's final counterproposal and implemented its final offer. After the employer notified the Union that it believed they had reached an impasse, the Union disagreed and asked that the employer resume bargaining. When the employer declared an impasse, therefore, the parties did not both believe they were at "the end of their rope." *Id.* at 212 (quotations and citation omitted).

The employer responds that the Board erred in weighing the Union's statements that the parties had not reached an impasse. According to the employer, we have previously held that the Board should avoid relying on a union's "twelfth-hour protestations and posturing" and "self-serving statement[s]" to negate "months[ of] fruitless bargaining" culminating in an impasse, *Laurel Bay Health & Rehab. Ctr. v. NLRB*, 666 F.3d 1365, 1375, 1376 (D.C. Cir. 2012) (cleaned up). The employer also contends that the Board cannot find that the parties are "at an impasse because they were at an impasse about whether they were at an impasse," *Grove v. NLRB*, 140 F.4th 506, 513 (D.C. Cir. 2025). But unlike *Laurel Bay*, the Board here did not

"ignore[] the parties' bargaining history" by "focus[ing] instead on their post-impasse conduct." *Laurel Bay*, 666 F.3d at 1375. And unlike *Grove*, the Board did not here rely solely on its finding that "[a]t no time . . . did both parties understand themselves to be at an impasse." *Grove*, 140 F.4th at 513 (quotations and citations omitted). The Board did consider other factors, particularly the parties' pre-impasse bargaining conduct. To the employer's detriment, however, that bargaining conduct evinced the employer's bad-faith approach to negotiations over Article 27.

## B.

Even if there had been a good-faith impasse over Article 27, it would have excused the employer from its duty to bargain only if such an impasse brought the negotiations to an overall standstill. There is a distinction "between an impasse on a single issue that would not ordinarily suspend the duty to bargain on other issues and the situation in which impasse on a single or critical issue creates *a complete breakdown in the entire negotiations*." *Wayneview Care Ctr.*, 664 F.3d at 349–50 (emphasis added) (quotations and citation omitted). As the Board correctly found, the employer's declaration of impasse over Article 27 did not excuse its bargaining duty because it did not completely breakdown the parties' negotiations.

The record supports the Board's finding that there was no overall breakdown in negotiations for a successor CBA. On the very morning that the employer implemented its final offer on Article 27, the parties exchanged counterproposals on Articles 8 and 19, and the parties subsequently reached an agreement resolving provisions other than Article 27. While our dissenting colleague suggests that *Erie Brush* precipitates a finding that the Article 27 deadlock caused an impasse even if the parties continued to "negotiate ancillary issues," Dissent

at 16, there is an obvious distinction between the matters. In *Erie Brush*, the union's chief negotiator testified that he and the negotiator for the employer agreed they were at an impasse. 700 F.3d at 19. Here, the employer's human resources manager testified that, when it declared an impasse over Article 27, the employer believed there was no impasse over any other provision in the CBA and that additional negotiations over other provisions were still "possibl[e]." J.A. 760; *see also* J.A. 163. Indeed, in the negotiation rules they adopted before bargaining began, the parties agreed to "first sign all the articles on which there [w]as no difference and then go on to negotiate those on which there [wa]s a difference." J.A. 750. Pursuant to those rules, the parties could have continued negotiating other CBA provisions and then returned to any provisions— like Article 27—over which a disagreement remained. The employer did not meet its burden to show that "the asserted deadlock over [Article 27] inhibited progress on any other aspect of the negotiations." *Wayneview Care Ctr.*, 664 F.3d at 350; *see also Atl. Queens Bus Corp.*, 362 NLRB No. 65, slip op. at 1 (2015) (finding a single-issue impasse can lead to an overall breakdown if "there can be no progress *on any aspect of the negotiations*" (emphasis in original) (quotations and citation omitted)).[5]

---

[5] The Board has repeatedly interpreted the third *CalMat* factor to require an overall breakdown in negotiations. *See, e.g.*, *Stephens Media Grp.-Watertown, LLC*, 371 NLRB No. 11, slip op. 8 n.51 (2021) (finding no overall breakdown in negotiations because "[t]he parties also made progress on other bargaining subjects"); *Stein Indus. Inc.*, 365 NLRB 227, 230 n.10 (2017) ("[T]he parties' differences on wages did not lead to a complete breakdown in the overall negotiations that would have prevented them from reaching agreement on any number of issues."); *Castle Hill Health Care Ctr.*, 355 NLRB 1156, 1188 (2010) (finding no overall breakdown in negotiations because the employer failed "to show that the parties had reached the sort of stalemate resulting in intractable positions on

Citing *CalMat*, the employer contends that the Board erred in considering the parties' post-impasse exchange of counterproposals to find there was no overall breakdown in negotiations. The employer's reliance on *CalMat* is misplaced. In *CalMat*, the Board determined that the parties attempt at post-impasse negotiations did not rebut a finding of an impasse, because the negotiations were "unproductive," "concluded on a harsh note," and involved parties that were "skeptical as to whether anything could be achieved" in the post-impasse negotiations. *CalMat*, 331 NLRB at 1099–1100. But here, the parties' post-impasse engagements led to agreements over other provisions of the CBA. And, in any event, the Board found that there was no overall breakdown in negotiations by relying principally on the parties' exchange of proposals contemporaneous to the declaration of impasse.

\* \* \*

Accordingly, substantial evidence supports the Board's determination that the parties had neither reached a good-faith impasse over Article 27 nor encountered an overall breakdown in negotiations.

**VI.**

For the foregoing reasons, we deny the petition for review and grant the Board's cross-appeal for enforcement of its decision and order.

*So ordered.*

---

any issue or group of issues which would render further bargaining futile").

RAO, *Circuit Judge*, dissenting: To find that Compañía Cervecera de Puerto Rico committed unfair labor practices, the National Labor Relations Board ignored the plain text of the collective bargaining agreement, penalized Cervecera's reasonable exercise of contractual rights, and misapplied the standard for finding a bargaining impasse. Because the Board's decision ignores basic principles of contract interpretation and is not supported by substantial evidence, I respectfully dissent.

I.

The majority opinion sets forth the factual background of this dispute in detail, so I highlight only some key facts. This case arises from a series of disputes between Compañía Cervecera de Puerto Rico (Cervecera), a brewing and bottling company based in Puerto Rico, and the Unión Independiente de Trabajadores de Cervecería India (the Union), which represents around 120 of Cervecera's employees. Cervecera and the Union began bargaining over a successor collective bargaining agreement in June 2021, just a few months before the 2018 collective bargaining agreement (the CBA) expired. The CBA contained two provisions central to this case. Article 34 granted the Union President up to 200 hours of unpaid sporadic leave per contract year for union business. It also granted the Union President the ability to exceed the 200-hour leave limit by "request[ing] a prolonged leave without pay" of "no less than six months." Article 27 governed employee work schedules.

By June 2021, the month negotiations began, Union President Abel Luciano had exceeded his 200-hour leave allowance under Article 34 for the 2020–21 contract year. Cervecera formally warned him in a May 2021 letter that he had reached his limit for the contract year and was required to "request a prolonged leave without pay of not less than six (6) months" if he needed more union time. Despite this warning, Luciano took leave in June, July, and August without

requesting the mandated extended leave. Cervecera chose not to enforce the prolonged leave requirement, explaining that negotiations had just begun and it desired "to keep … good employer-employee relations at that time."

As negotiations progressed, a separate disciplinary issue arose. In August 2021, Luciano violated company policy by standing at his workstation outside of his scheduled shift in protest of work schedule changes and refusing to leave when asked by a manager. For this violation, Cervecera suspended Luciano without pay for one month and issued him a written warning advising that any further violation of company rules could result in his dismissal.

The leave issue arose again during the 2021–22 contract year. On December 1, 2021, Cervecera warned Luciano that his "union leave [was] exhausted," that his absences could not "be adjudicated to it," and that he needed "to request the extended union leave provided by the agreement … so that [his] disciplinary file related to these unjustified absences" would not affect him. On April 27, 2022, Luciano exceeded the 200-hour limit without requesting prolonged leave, in violation of Article 34. Despite its previous warning that future violations of company rules could result in termination, Cervecera did not terminate Luciano but instead placed him on the six-month leave without pay contemplated by Article 34.

Meanwhile, bargaining over employee work schedules in Article 27 of the new collective bargaining agreement had stalled. Due to significant business expansion since the negotiation of the prior CBA, Cervecera needed to implement a 24/7 production schedule to meet increased market demand. Cervecera proposed various employee work schedules that it believed would meet its operational demands, but none of those proposals satisfied the Union's desire for consistency in days

off. In June 2022, Cervecera submitted its "final offer" on work schedules, which the Union rejected a month later. A few days after that, the Union submitted a counterproposal that was substantively identical to the one they submitted at the start of negotiations and that Cervecera had already rejected. Believing further talks were futile and desiring resolution of this important issue, Cervecera declared an impasse on Article 27 and implemented its final employee schedule offer on August 15, 2022. Negotiations on other articles continued.

The Union filed charges with the Board, which found that Cervecera had committed three unfair labor practices. The Board concluded Cervecera had: (1) unilaterally changed the terms of union leave, in violation of sections 8(a)(5) and (1) of the National Labor Relations Act (the Act); (2) placed Luciano on prolonged leave in retaliation for his union activities, in violation of sections 8(a)(3) and (1); and (3) implemented its final offer on work schedules in the absence of an impasse, also in violation of sections 8(a)(5) and (1). Cervecera petitioned for review, and the Board cross-petitioned for enforcement.

## II.

On a petition for review, we "must evaluate both the Board's statements of law and application of law to the facts." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 475 (D.C. Cir. 2020). "We owe no special deference to the Board's interpretation of contract language, but review it *de novo*, applying ordinary principles of contract law." *Hosp. de la Concepcion v. NLRB*, 106 F.4th 69, 76 (D.C. Cir. 2024) (cleaned up); *see also Am. Med. Response of Conn., Inc. v. NLRB*, 93 F.4th 491, 496 (D.C. Cir. 2024) ("Courts and the Board are bound to enforce lawful labor agreements as written.") (cleaned up).

The Board's factual findings will be upheld if they are supported by substantial evidence, which is "such evidence that a reasonable mind might accept as adequate to support a conclusion." *NCRNC, LLC v. NLRB*, 94 F.4th 67, 72 (D.C. Cir. 2024) (cleaned up). Although our review is deferential, we are not a mere "rubber stamp." *Circus Circus*, 961 F.3d at 484. Our duty is to ensure the Board's decisions are "reasonable and reasonably explained." *Id.* at 475 (cleaned up). We will vacate the Board's decision if "the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *NCRNC*, 94 F.4th at 72 (cleaned up).

## III.

The Board's first two unfair labor practice findings stem from a single event: Cervecera's decision to place Luciano on prolonged leave after he exceeded the 200-hour limit in Article 34. The Board concluded this action was a unilateral change to a mandatory subject of bargaining and also anti-union retaliation. Because Cervecera's action followed from a straightforward application of the CBA and company policy, the Board erred as a matter of law.

## A.

Cervecera did not unilaterally change a policy; it gave Luciano the benefit of the prolonged leave established in Article 34. An employer does not alter terms and conditions of employment when it does nothing more than apply a contract's bargained-for procedure. The Board's conclusion that Cervecera violated section 8(a)(5) by unilaterally changing its union leave policy rests on two errors. First, the Board misinterpreted Article 34 of the CBA to prevent Cervecera from enforcing the 200-hour limit on union leave. Second, the Board incorrectly found that a single instance of waiving the

limit created a binding past practice that overrode the clear terms of the CBA.

Under section 8(a)(5) of the Act, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). In a situation like this one, where a prior collective bargaining agreement expires while negotiations of a successor agreement are ongoing, this duty requires an employer to maintain the status quo by adhering to the terms of the expired agreement until the parties reach either a final agreement or a good-faith impasse. *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 373–74 (D.C. Cir. 2017). The primary source for defining the status quo is the text of the expired CBA. *See id.* at 374 ("In defining the post-expiration status quo in this case … we look to the substantive terms of the [expired] CBA.").

Luciano's ability to take leave was governed by Article 34 of the CBA and Cervecera's separate Attendance Policy, which has been in place since 2010. Article 34 of the CBA granted the Union President up to 200 hours of unpaid sporadic leave per year for union business, after which the CBA established a mandatory procedure for additional time: "the employee shall request a prolonged leave without pay, no less than six months." This special leave program for the Union President operated alongside the company's Attendance Policy, which prohibited absences except for certain justified reasons and required employees to submit an "Absence Report" *before* taking any leave. The Attendance Policy included "Union leave" as a justified absence but explicitly noted that leave "cannot exceed the maximum number of hours allowed by the corresponding collective bargaining agreement" and "must comply with the conditions settled in the corresponding collective bargaining agreement." The Policy defined

unexcused absences as cause for discipline up to and including job dismissal.

Luciano had a documented pattern of violating the Attendance Policy as well as other company policies. He routinely took sporadic leave without filing the appropriate absence forms, and he exceeded his 200-hour leave limit during the 2020–21 contract year without requesting prolonged leave, despite repeated warnings from management. His insubordination arguably peaked in August 2021, when he showed up to work outside of his shift in protest of a work schedule change and refused to leave. Cervecera sent Luciano a letter explaining his "action constitute[d] an act of insubordination, refusal to follow reasonable work-related orders, a violation of established work rules, disorderly conduct, and being unrespectful to management." Following the disciplinary policy in the CBA, the company suspended Luciano without pay for a month and warned that any "relapse into another discipline related violation" would result in him being "submitted to what was established in the current Collective Bargaining Agreement … job dismissal." Despite that clear warning, in April 2022, Luciano took additional union leave that pushed him over the 200-hour limit for the 2021–22 contract year without requesting the prolonged leave Article 34 required. This violation of the Attendance Policy, as governed by Article 34, was a dismissible offense when considered with his previous violations of the Attendance Policy.

Faced with Luciano's numerous violations, Cervecera had several options consistent with the CBA. It could (1) enforce its warning letter and dismiss Luciano for violating the Attendance Policy; (2) take Luciano's absences as a constructive request for the six-month prolonged leave contemplated by the CBA; or (3) excuse the violations and

waive its right to enforce the contract. Cervecera chose the middle path. Instead of dismissing Luciano, it gave him the benefit of a prolonged leave. This action was not a change to Article 34 but a straightforward application of its terms that allowed Luciano to avoid being found in violation of the Attendance Policy and losing his job.

The Board's conclusion to the contrary, which the majority affirms, rests on two errors. First, the Board adopted the view that because Article 34 states the employee "shall request" the prolonged leave, the employer is powerless to impose it if the employee fails to make a proper request. *See* Majority Op. at 16–17. This interpretation, which focuses on the employee's duty to request leave, reads the provision in a vacuum and ignores the employer's contractual rights to enforce its bargained-for terms. Article 34 dictates the *employee's* responsibilities and duties. Luciano violated the contract when he took more than 200 hours of union leave without requesting prolonged leave. Because of the violation, Cervecera was entitled to dismiss Luciano or to discipline him in some other way. In an act of leniency, Cervecera treated the unapproved absence as a request to use his prolonged leave benefit.

Nothing in the CBA suggests that Cervecera had an all-or-nothing choice under Article 34 to either fire the Union President in the middle of negotiations or to ignore his absences completely. *See Circus Circus*, 961 F.3d at 480 ("The [NLRA] does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them.") (cleaned up). Cervecera could have chosen discipline when faced with Luciano's disregard of the 200-hour limit. Instead, it chose to construe Luciano's absence as a request for an option already set forth in the CBA, namely an extended period of unpaid leave for union work.

Second, the Board erred by finding that a single, previous act of leniency created a binding "past practice" of unlimited leave that amended the CBA's terms. At the start of negotiations in 2021, Cervecera allowed Luciano to exceed his leave allotment for the stated purpose of keeping "good employer-employee relations." The Board treats Cervecera's decision to refrain from disciplining Luciano in that year as establishing a binding new policy of unlimited leave.

This conclusion is foreclosed by our precedent. In *Sasol North America Inc. v. NLRB*, we squarely rejected the idea that an employer's failure to enforce a written leave rule creates a new contractual right for employees. 275 F.3d 1106, 1111 (D.C. Cir. 2002). In that case, the written rule limited union leave to a "reasonable time." *Id.* at 1108–09. An employee was permitted to take extensive union leave over the course of a year and then claimed a change of company policy when the employer said it expected to approve less leave in the future. *See id.* We held that an employer does not "change" its policy when it is "merely *enforcing* a pre-existing" written rule, and we emphasized that allowing an employee to get away with "lavish leave for a year or so does not establish that there was ever a general *policy* of unlimited leave." *Id.* at 1110–11. Here Cervecera excused Luciano's violation of Article 34 on a single occasion, which cannot establish a past practice that rewrites contractual terms. *See Wendt Corp. v. NLRB*, 26 F.4th 1002, 1014 (D.C. Cir. 2022) (explaining that to establish a past practice an event must "occur[] with such regularity and frequency that employees could reasonably expect the practice to reoccur on a consistent basis") (cleaned up). Our precedents repeatedly reaffirm that a one-time exception does not effectively amend a collective bargaining agreement.

The majority's attempt to distinguish *Sasol* is unpersuasive. It argues that, unlike the employer in *Sasol*,

Cervecera was "aware" it was not enforcing the rule during the 2020–21 contract year. *See* Majority Op. 20–21. That is a distinction without a difference. The core holding of *Sasol* is that the objective, written terms of a contract define the status quo, not the employer's state of mind during a period of non-enforcement. 275 F.3d at 1111. A one-time, discretionary act of grace, extended for a specific, articulated business reason, does not change the terms of a contract.[1]

Cervercera merely exercised its contractual rights by responding to Luciano's violation of Article 34. In concluding that Cervecera's actions constituted an unfair labor practice, the Board erred as a matter of law.

B.

The Board's conclusion that Cervecera violated section 8(a)(3) of the Act rests on a similar misinterpretation of the CBA and is unsupported by substantial evidence. Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer violates this section when it "terminate[s] or otherwise discipline[s] an employee because of conduct protected by the Act." *Circus Circus*, 961 F.3d at 480. The Board's holding here fails for two independent reasons. First, placing Luciano on prolonged leave was not an "adverse employment action" under these

---

[1] Reinforcing this conclusion, the record shows that even as they negotiated a successor agreement, both Cervecera and the Union agreed to leave the language of Article 34 unaltered. This mutual agreement demonstrates a shared understanding that the text of Article 34, and not the prior year's discretionary leniency, governed the terms of union leave.

circumstances. Second, even if the action was adverse, the Board failed to properly apply the *Wright Line* framework.

1.

A finding of unlawful retaliation under section 8(a)(3) of the Act "requires a predicate determination that an employer took an adverse action." *Bellagio, LLC v. NLRB*, 854 F.3d 703, 709 (D.C. Cir. 2017). "Adverse acts are those that reduce a worker's prospects for employment or continued employment, or worsen some legally cognizable term or condition of employment." *Id.* The inquiry demands a contextual assessment of the employer's action, considering the terms of the CBA and the employee's conduct.

Cervecera's action was not an "adverse employment action." As explained above, Luciano violated the union leave limits in Article 34, and he was warned that further violations could result in dismissal. Cervecera chose not to dismiss Luciano, but instead to take his action as a constructive request for the prolonged leave permitted by Article 34. Judged against the contractual baseline of termination, Cervecera acted with leniency, which by definition is not an adverse action.

Today's decision nominally supports the rights of employees. But by treating an act of leniency as a contractual violation, the majority may create a perverse incentive for employers to exercise their contractual rights in full. That is, if exercising leniency might result in liability for an unfair labor practice, an employer may instead choose to impose a harsher contractual sanction.[2]

---

[2] The majority upholds the Board's flawed conclusion by focusing on the fact that Luciano's leave was unpaid. *See* Majority Op. 8–9.

11

2.

Even if placing Luciano on leave could be considered an adverse action, the Board's finding that it was motivated by anti-union animus is unsupported by substantial evidence. When an employer offers a legitimate basis for its action, the Board applies the *Wright Line* burden-shifting framework. 251 N.L.R.B. 1083, 1088–89 (1980). Under that standard, "the general counsel must first establish a *prima facie* case that animus against protected activity was a motivating factor in the employer's decision." *Circus Circus*, 961 F.3d at 480 (cleaned up). If that burden is met, "the burden of persuasion shifts to the employer to show it would have taken the same action even in the absence of the protected conduct." *Id.* at 480 (cleaned up). The Board's analysis fails at both steps.

At the first stage of the *Wright Line* test, the Board's general counsel must demonstrate that the employee was engaged in a protected union-related activity, that "the employer was aware of that protected activity, and" that "the protected activity was a motivating factor in the employer's decision to take [an] adverse action" against the employee. *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (cleaned up). There is no dispute that Luciano was engaged in a protected union activity and that Cervecera was aware of this. But the Board's conclusion that Cervecera was motivated by animus rests on a trio of flawed inferences.

First, the Board inferred animus from the temporal proximity between a settlement agreement reached in March

---

This ignores the relevant context by comparing the unpaid leave as an alternative to Luciano's active employment. In these circumstances, however, the alternative to placing Luciano on temporary, unpaid leave was not a paid sabbatical; it was termination.

2022 and the April 2022 leave action. The majority endorses this inference, reasoning that Cervecera was retaliating against Luciano for forcing the company to settle a protracted dispute. *See* Majority Op. 11–13. The inference of animus here fails to comport with the facts. As Cervecera explains, the settlement was a positive development for the company because it amicably ended a pending dispute with the Union. Neither the Board nor the majority explain how a mutually beneficial settlement would provoke a company to retaliate against the union leader who helped achieve it.

Second, the Board inferred animus based on the company's unilateral schedule change in July 2021, an action the Board found to be an unfair labor practice. This reliance on stale events is similarly flawed. While the Board may in some cases consider pre-settlement conduct as background evidence of motive, its probative value diminishes with time and is negated by a subsequent amicable resolution. Here, any inference of animus is broken by the nine-month gap between the schedule change and the placement of Luciano on leave. *See MECO Corp. v. NLRB*, 986 F.2d 1434, 1437 (D.C. Cir. 1993) (explaining an eight-month gap "strongly militates against any inference of anti-union motivation"). Moreover, the parties' subsequent amicable settlement extinguishes any probative value of this past event. The Board again fails to connect the dots and explain why an employer would be provoked to retaliate by a nine-month-old dispute that had been settled to its benefit.

Finally, the Board inferred animus because Cervecera departed from past practice when it placed Luciano on a six-month leave after he exceeded the 200-hour sporadic leave limit. This finding fails for the reasons already explained. There was no past practice here that modified the terms of the CBA, and a single, discretionary act of leniency does not create

a new, binding policy. *See Sasol*, 275 F.3d at 1111. The majority explicitly declines to address the merits of the past practice argument, finding the other evidence of animus sufficient. Majority Op. 15–16. But the other evidence does not logically support an inference of animus, and by sidestepping this critical issue, the majority avoids confronting the weakness of the Board's case.

Finally, even assuming a *prima facie* case was made, the Board erred by rejecting Cervecera's legitimate, non-discriminatory reason for its action. Under *Wright Line*'s second step, an employer can defeat a charge by showing that it "reasonably believed the employee committed the acts supporting discipline" and that its decision was "consistent with the company's policies and practice." *Circus Circus*, 961 F.3d at 481 (cleaned up). Cervecera easily met this burden. Luciano had committed a terminable offense by taking unauthorized leave after receiving an explicit final warning. Cervecera's response was entirely consistent with the company's Attendance Policy and the CBA. Even if the leave was applied to Luciano as a punishment and not as a benefit, Cervecera was well within its rights to impose a more lenient punishment when a harsher punishment would have been consistent with the CBA and its policies.

## IV.

The Board's final conclusion, that Cervecera violated section 8(a)(5) of the Act by unlawfully implementing its last offer on work schedules without reaching a lawful impasse, is also unsupported by substantial evidence and contrary to this court's precedent. An employer may unilaterally implement a proposal after the parties have bargained in good faith to an impasse. *See TruServ Corp. v. NLRB*, 254 F.3d 1105, 1113–14 (D.C. Cir. 2001). When the deadlock is over a single issue, an

overall impasse sufficient for unilateral implementation exists if the issue is of critical importance; the parties have reached a good-faith impasse as to that issue; and the impasse has caused a "breakdown in the overall negotiations." *Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 21 (D.C. Cir. 2012). The Board correctly found Article 27 was an issue of critical importance for both parties, but it erred in finding there was no good-faith impasse and no overall breakdown in negotiations.

A.

Substantial evidence demonstrates the parties had reached a good-faith impasse on Article 27. An impasse is reached when good-faith negotiations have "exhausted the prospects of concluding an agreement." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 (D.C. Cir. 2011) (cleaned up). The parties bargained over Article 27 for nine months, exchanging more than a dozen proposals with no meaningful progress. Throughout the negotiations, their positions on the fundamental structure of the workweek remained diametrically opposed: Cervecera required a flexible schedule capable of supporting its 24/7 operations, while the Union insisted on a schedule that maintained more consistency with regard to days off. Both parties had repeatedly rejected offers by the other that attempted to work around these core disagreements, and after nine months of negotiations, neither party was willing to budge.

The futility of further talks was confirmed by the final exchange. After failing to reach any agreement over the critical terms, Cervecera proposed its "final offer." The Union rejected that offer. Then, rather than offer a new compromise, the Union submitted a counterproposal that was substantively identical to one Cervecera had rejected eight months prior. *Compare* J.A. 453, *with* J.A. 653. This return to a long-rejected offer is a

strong indicator that the Union had no real intention of moving from its position. Given the persistent intractability on the question of work schedules, Cervecera in good faith concluded that the prospects for an agreement had been exhausted. An employer is not required to "engage in fruitless marathon discussions." *NLRB v. Am. Nat'l Ins. Co.*, 343 U.S. 395, 404 (1952).

The majority upholds the Board's contrary finding by placing undue weight on the Union's self-serving claim that it wanted to continue negotiations. Majority Op. 23–25. But an impasse cannot be defeated by "twelfth-hour protestations and posturing." *Laurel Bay Health & Rehab. Ctr. v. NLRB*, 666 F.3d 1365, 1375 (D.C. Cir. 2012). A union's "bald statement of disagreement" is not enough to defeat a good-faith impasse. *TruServ*, 254 F.3d at 1117. Otherwise, an employer would "virtually never be entitled to implement a final offer." *Mike-Sell's Potato Chip Co. v. NLRB*, 807 F.3d 318, 323 (D.C. Cir. 2015).

B.

The Board also erred in finding the impasse on Article 27 did not lead to a "breakdown in overall negotiations." *Erie Brush*, 700 F.3d at 23. This court has long recognized that a deadlock on a single, critical issue can cause an overall breakdown, even if the parties continue to discuss other matters. *See id.* If an impasse exists on a critical "make or break" issue that "pervade[s] the negotiations," then that deadlock has "destroyed any opportunity for reaching a [successor] collective-bargaining agreement." *Id.* (cleaned up).

That is precisely the situation here. Article 27 was a critical issue for both parties, a point that all acknowledge. *See* J.A. 760 ("Here, there is no dispute, and the record shows, that Article 27's work schedule and pay provisions were highly

important to both parties."); Majority Op. 23 ("From the onset of the negotiations, the parties recognized that Article 27 was going to be a critical issue."). Without an agreement on the fundamental structure of the workweek, no final collective bargaining agreement was possible. The continued exchange of proposals on other ancillary articles does not change this reality. Because the impasse on Article 27 rendered a final agreement on a successor collective bargaining agreement impossible, it created a breakdown in the overall negotiations, entitling Cervecera to lawfully implement its final offer.

The majority's conclusion that no breakdown occurred because the parties could still negotiate ancillary issues is in direct conflict with our holding in *Erie Brush*. *See* Majority Op. 25–27. In that case, we held a deadlock on a "make or break" issue can cause an impasse even if other matters remain open for negotiation, because neither party would sign a final contract without agreement on the critical term. *Erie Brush*, 700 F.3d at 23. The majority's suggestion that progress on ancillary issues could somehow break the deadlock on the foundational issue of work schedules is the type of "rank speculation" we have rejected. *Id.* The test for an impasse is not whether parties might still reach consensus on other minor items, but whether the deadlock on a critical issue has "destroyed any opportunity for reaching a [successor] collective-bargaining agreement." *Id.*

Once it was clear that no agreement was possible on the fundamental structure of the workweek, no final collective bargaining agreement was achievable. As a result, the Board's finding that no impasse existed is contrary to our precedent and unsupported by the record.

17

\* \* \*

Because the Board's decision rests on a misinterpretation of the CBA and is unsupported by substantial evidence, I would grant Cervecera's petition for review.